[No. 23757-1-II. Division Two. December 15, 2000.]

THE STATE OF WASHINGTON, *Respondent*, v. TERESA ANN BOTTRELL, *Appellant*.

*Suzan L. Clark*, for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney*, and *John P. Fairgrieve, Deputy*, for respondent.

BRIDGEWATER, J. — Teresa Ann Bottrell was charged with first degree premeditated murder and first degree felony murder in the death of John Hall. She appeals her convictions for first degree felony murder and the lesser included offense of premeditated murder, i.e., second degree murder.

With regard to the charge of first degree premeditated murder, Bottrell offered testimony that she suffered from posttraumatic stress disorder (PTSD). The testimony was relevant and admissible because the psychiatric community recognizes a link between PTSD and diminished capacity. In addition, the medical testimony indicated that Bottrell

suffered from PTSD and she might have experienced a flashback at the time of her struggle with Hall, impairing her ability to act with intent. We hold that the trial court erred in failing to allow the testimony regarding PTSD because it may have negated the intent necessary for this crime and the lesser included offense of second degree murder. We reverse that conviction and remand.[1]

But, we affirm the conviction for felony murder. We hold that the offer of proof of PTSD did not include the intent required under the felony murder charge of homicide/ robbery. We hold that there was sufficient evidence to find that Bottrell had the intent to rob Hall before she went to his home, and that she killed him during the course of, or in furtherance of, or in flight from, the robbery.

## FACTS

In late 1997 and early 1998, Teresa Bottrell was incarcerated in the Clark County Jail for a forgery conviction. While in jail, Bottrell learned that John Hall, a person much older than she who was not incarcerated, was willing to deposit money in female inmates' jail accounts in exchange for telephonic sexual conversation. Bottrell needed money, so she called Hall from the jail and spoke with him several times. Hall visited her at the jail and she obtained probation permission to live at his house upon her release. Hall hoped to get sexual favors from Bottrell. Upon her release, she visited Hall at his home several times.

On the night of Hall's murder, Bottrell went to Hall's house. Bottrell testified that she went there to get money from Hall by having sex with him. She and Hall talked about what he wanted before Hall went into the bedroom.

According to Bottrell, Hall asked her to tie him up and put tape over his mouth. She took a roll of duct tape and

---

[1] The new trial would be as to second degree murder, not first degree premeditated murder. *See Green v. United States*, 355 U.S. 184, 187, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957); *State v. Anderson*, 96 Wn.2d 739, 742, 638 P.2d 1205 (1982).

went into the bedroom. Hall was lying on the bed, propped up against a pillow. She tore off some of the tape, then changed her mind, told him no, and threw down the tape. Hall hit her in the face and they began to fight. During the struggle, Bottrell hit Hall with a lacquered wooden ornamental duck and a clock radio. While Hall was on the floor, Bottrell got up, grabbed a pair of scissors, and cut a piece of the phone cord. Hall asked Bottrell for help and then he grabbed her again. So, she "tried to tie his hands [with the cord], but . . . got it around his neck" instead. Report of Proceedings at 502.

Bottrell next remembers standing against the wall looking down at Hall, touching him with her foot, and noticing that he did not move. She testified that at that point, she realized Hall was dead. She also testified that during the struggle with Hall she thought about past events in her life. She thought about an incident where her mother tried to run over her father with the car. She thought about her father's alcoholism and him beating her as a child. Bottrell thought about a man who had almost killed her when she was hitchhiking.

When she realized Hall was dead, Bottrell attempted to clean up and cover up by changing her clothing and starting a load of laundry. She tried to burn a towel, setting off the smoke alarm. Then she went into the bedroom, got Hall's safe out, and rifled through it looking for money. She and her boyfriend, Larry Jones, later returned looking for money. They stole Hall's keys and his Lincoln Continental.

Bottrell acknowledged that on February 28, 1998, the night of the homicide, she went to Hall's house planning to get money from him. Sometime before the night of the homicide and while still incarcerated, Bottrell told a fellow inmate that she would take Hall for everything he had, including his Lincoln Continental, Jeep, tools, and checkbook. She previously told another inmate, sometime before February 14, that she would marry Hall; because he was old and on insulin, it would not take long for him to die; and if he had an overdose of insulin, he would die and every-

thing would be hers. Although Bottrell claimed initially to have planned to exchange sex with Hall for money, she testified that she stole two of Hall's checks the day before his death and gave them to Jones, who tried to forge and to cash them. After Hall's death, while incarcerated in the Portland jail, Bottrell told yet another inmate that: she had gone over to Hall's house planning to take money and "stuff," which prompted Hall to call the police and precipitated the fight; she was glad she had killed him; and she was going to claim that she killed him because he was a child molester.

Bottrell was charged by an amended information with one count of first degree premeditated murder and one count of first degree felony murder, with a predicate crime of robbery. The jury returned a verdict of guilty of the lesser included offense of second degree murder on count one and first degree felony murder on count two.[2]

## I. MURDER IN THE SECOND DEGREE

### A. Standard of Review

■ A trial court's evidentiary rulings are reviewed for an abuse of discretion. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

### B. Dr. Stanulis

#### 1. ER 702, 401, and 402[3]

---

[2] The parties agreed that the sentences merged and only one counted in determining Bottrell's offender score. Only one sentence was imposed because only one murder occurred. The judgment and sentence stated that the crimes encompassed the same criminal conduct and counted as one crime in determining criminal history.

[3] ER 702. Testimony By Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 401. Definition of "Relevant Evidence"

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

■■■■ "Diminished capacity is a mental condition not amounting to insanity which prevents the defendant from possessing the requisite mental state necessary to commit the crime charged." *State v. Warden*, 133 Wn.2d 559, 564, 947 P.2d 708 (1997). Here, part of Bottrell's defense was that her ability to form the requisite intent was impaired by PTSD.[4] First degree premeditated murder requires "premeditated intent." RCW 9A.32.030(1)(a). The lesser included crime of second degree murder requires the "intent to cause the death of another person."[5] The State bears the burden of proving beyond a reasonable doubt that the defendant had the requisite mental state for the crime charged. *State v. James*, 47 Wn. App. 605, 609, 736 P.2d 700 (1987). When specific intent or knowledge is an element of the crime charged, a defendant is entitled to present evidence showing an inability to form the specific intent or knowledge at the time of the crime. *State v. Edmon*, 28 Wn. App. 98, 102-04, 621 P.2d 1310, *review denied*, 95 Wn.2d 1019 (1981); *State v. Martin*, 14 Wn. App. 74, 75, 538 P.2d 873 (1975), *review denied*, 86 Wn.2d 1009 (1976).

Bottrell argues that the trial court should have allowed her expert, Dr. Robert Stanulis, to testify that she suffered from PTSD and had diminished capacity. Bottrell contends that the foundational requirements for admissibility of Dr. Stanulis's testimony as set forth in *State v. Edmon* are not absolute and that the testimony should have been admissible under ER 702, ER 401, ER 402, and *State v. Ellis*, 136 Wn.2d 498, 963 P.2d 843 (1998). The State responds that the *Edmon* factors were not satisfied, and that *Ellis* is

---

ER 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible

All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. Evidence which is not relevant is not admissible.

[4] RCW 9A.08.010(1)(a). "INTENT. A person acts with intent or intentionally when he acts with the objective or purpose to accomplish a result which constitutes a crime."

[5] RCW 9A.32.050(1)(a).

inapposite because it involved a capital case. The trial court did not have the benefit of the Supreme Court's later decisions and it considered Dr. Stanulis's testimony under the foundational requirements set forth in *State v. Edmon.*[6] The trial court determined that the foundational requirements were not met and excluded the testimony.

■ In 1998, a month after Bottrell was sentenced, the Supreme Court announced that it did "not adopt the foundational requirements announced in *Edmon* as absolute." *State v. Ellis*, 136 Wn.2d 498, 522, 963 P.2d 843 (1998). "In excluding the expert testimony on diminished capacity in the State's motion in limine, the court unreasonably and prematurely concluded the foundation for admissibility had not been satisfied. The court should have considered admissibility under ER 702 and application of ER 401 and 402." *Ellis*, 136 Wn.2d at 523. In reaching its decision, the court emphasized that *Ellis* was a capital case. *Ellis*, 136 Wn.2d at 522. Here, the State argues that *Ellis* is not the law in noncapital cases such as Bottrell's. But, this is not a proper

---

[6] "1. The defendant lacked the ability to form a specific intent due to a mental disorder not amounting to insanity.

"2. The expert is qualified to testify on the subject.

"3. The expert personally examines and diagnoses the defendant and is able to testify to an opinion with reasonable medical certainty.

"4. The expert's testimony is based on substantial supporting evidence in the record relating to the defendant and the case, or there must be an offer to prove such evidence. The supporting evidence must accurately reflect the record and cannot consist solely of uncertain estimates or speculation.

"5. The cause of the inability to form a specific intent must be a mental disorder, not emotions like jealousy, fear, anger, and hatred.

"6. The mental disorder must be causally connected to a lack of specific intent, not just reduced perception, overreaction or other irrelevant mental states.

"7. The inability to form a specific intent must occur at a time relevant to the offense.

"8. The mental disorder must substantially reduce the probability that the defendant formed the alleged intent.

"9. The lack of specific intent may not be inferred from evidence of the mental disorder, and it is insufficient to only give conclusory testimony that a mental disorder caused an inability to form a specific intent. The opinion must contain an explanation of how the mental disorder had this effect."

*Edmon*, 28 Wn. App. at 102-03 (citations omitted).

reading of *Ellis*, nor is the State's position supported by subsequent case law. *See State v. Greene*, 139 Wn.2d 64, 984 P.2d 1024 (1999), *cert. denied*, 529 U.S. 1090 (2000); *State v. Mitchell*, 102 Wn. App. 21, 997 P.2d 373 (2000); *State v. Atsbeha*, 96 Wn. App. 654, 981 P.2d 883 (1999), *review granted*, 140 Wn.2d 1001 (2000).

The Supreme Court has reiterated its holding in *Ellis*:

> ER 702 controls the analysis for both insanity and diminished capacity. The State asks us to revisit our recent decision in *State v. Ellis*, in which we held the admissibility of expert testimony regarding diminished capacity is to be determined under ER 702. We decline the State's invitation. ER 702 is the standard for admissibility of expert testimony in Washington.

*Greene*, 139 Wn.2d at 73 n.3 (citations omitted) (expert testimony excluded because it was not possible to reliably connect the symptoms of dissociative identity disorder to the mental capacity of the defendant).

Recently, Division One has followed *Ellis* when making decisions regarding the exclusion of expert testimony in noncapital cases. *Mitchell*, 102 Wn. App. 21 (defendant was convicted of one count of third degree assault and two counts of fourth degree assault); *Atsbeha*, 96 Wn. App. 654 (defendant was convicted of possession of a controlled substance with intent to deliver).

2. Psychiatric Community Recognition

According to the American Psychiatric Association:

> The essential feature of Posttraumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate.

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 424 (4th ed. 1994).

One hallmark of PTSD is flashback, a condition "during which components of the [traumatic] event are relived and the person behaves as though experiencing the event at that moment." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 424 (4th ed. 1994). When a person has a flashback, he or she undergoes an "alteration in the perception or experience of the self in which the usual sense of one's own reality is temporarily lost or changed." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 275 (3d rev. ed. 1987). While in this state, the person experiences "[v]arious types of sensory anesthesia and a sensation of not being in complete control of one's actions, including speech." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 275 (3d rev. ed. 1987). So, a person who truly suffers from PTSD could experience a flashback and during that flashback might be unable to control his or her actions. As one commentator stated:

> Ordinarily, persons with PTSD are in contact with reality and do not display any symptoms of psychosis such as hallucinations or delusions. PTSD is essentially an anxiety disorder. However, some patients, especially those who are subsequently subjected to extreme stress, develop a transient dissociative reaction with episodes of depersonalization or derealization. Most of the time, these feelings of unreality pass without incident, but occasionally criminal behavior may erupt. The question of criminal responsibility, therefore, is pertinent since a person's cognitive or volitional state may be impaired during a dissociative reaction.

CHESTER B. SCRIGNAR, POSTTRAUMATIC STRESS DISORDER: DIAGNOSIS, TREATMENT, AND LEGAL ISSUES, 245 (2d ed. 1988).

██ Washington case law acknowledges that PTSD is recognized within the scientific and psychiatric communities and can affect the intent of the actor resulting in diminished capacity. *See State v. Janes*, 121 Wn.2d 220, 233-36, 850 P.2d 495 (1993) (battered woman and battered child syndromes are a subset of PTSD and are admissible to show how severe abuse affects the battered person's per-

ceptions and reactions); *see also State v. Riker*, 123 Wn.2d 351, 869 P.2d 43 (1994). Other cases that acknowledge the link and the defense, although not directly addressing the issue before us are: *State v. Warden*, 133 Wn.2d 559, 564, 947 P.2d 708 (1997) and *State v. Hamlet*, 133 Wn.2d 314, 944 P.2d 1026 (1997).

Therefore, we hold that PTSD is generally accepted by the scientific and psychiatric communities as a condition that may result in the diminished capacity of the actor.

3. Offer of Proof and Admissibility of Dr. Stanulis's Testimony

■ There is no dispute that Dr. Stanulis qualified as an expert under ER 702. Because a generally-accepted link exists between PTSD and diminished capacity, the trial court should have admitted the testimony of Dr. Stanulis if he testified that: (1) Bottrell suffered from PTSD; (2) as a result of her PTSD she experienced flashbacks during the incident with Hall; and (3) the flashbacks impaired her ability to act with intent. Dr. Stanulis evaluated Bottrell by reviewing over nine years of police reports, interviewing her for about four-and-a-half hours, and administering the Minnesota Multiphasic Personality Inventory. Dr. Stanulis testified to each element during the offer of proof. First, Dr. Stanulis testified that Bottrell suffered from PTSD. According to him, Bottrell "met the criteria for posttraumatic stress disorder[,]" and opined "to a medical certainty" that she suffered from the condition. Report of Proceedings at 88 and 90-91. The State's expert, Dr. Ronald Hart, agreed that Bottrell was suffering from resolving PTSD, but asserted that its onset was triggered by Hall's death. Second, Dr. Stanulis testified that Bottrell experienced flashbacks during the incident with Hall: "at the time of [the incident with Hall] . . . she was describing, symptoms of a flashback, she was re-experiencing past abusive episodes." Report of Proceedings at 92.

Finally, Dr. Stanulis testified that Bottrell's flashbacks impaired her ability to act with intent:

A: [The flashbacks] are, of course, by definition quite emo-

tionally laden events, and they would directly affect her ability to both perceive what was going on about her accurately and to form specific intents.

Q: Do you have an opinion as to what triggered the inability to form the specific intent?

A: Well, she was clearly in a position where she perceived herself again in an abusive position where her life was being threatened. Again, to what degree that is from a reasonable perspective and what degree that is influenced by her hypervigilance and her PTSD, which would tend to see things as sometimes more dangerous than they are, I think both are arguably present.

Certainly when you start to be flooded with memories of abusive events, emotional, that's a very strong emotional content. This is an individual who has lived many years of her life as a substance abuser to avoid those feelings. So it's hard to imagine that when those feelings and those memories are flooding her that she would be able to form the specific intent and be responding only to that which is in front of her.

Report of Proceedings at 92-93.

Under ER 702, Dr. Stanulis's testimony would assist the jury in determining if Bottrell had the requisite specific intent to murder Hall. "[M]ental disorders are beyond the ordinary understanding of lay persons." *Ellis*, 136 Wn.2d at 517. Such evidence is relevant, under ER 401 and ER 402, to determine whether Bottrell's mental capacity was diminished. Further, Dr. Stanulis's testimony was admissible because he based it upon a "medical certainty" that the malady, PTSD, affected Bottrell. This standard is consistent with established case law. *See Edmon*, 28 Wn. App. at 102 (expert must examine and diagnose defendant personally and testify "to an opinion with reasonable medical certainty"); *State v. Martin*, 14 Wn. App. 74, 76-77, 538 P.2d 873 (1975) (expert proposing to testify that criminal defendant could not form specific intent must base testimony on a "reasonable medical certainty"); *State v. Fullen*, 7 Wn. App. 369, 383, 499 P.2d 893 ("[i]f the candid medical expert cannot state an opinion with reasonable medical certainty because the symptoms before him are insufficient to sup-

port an expert opinion, then he may not speculate"), *review denied*, 81 Wn.2d 1006 (1972), *cert. denied*, 411 U.S. 985 (1973); *State v. Moore*, 7 Wn. App. 1, 499 P.2d 16, *review denied*, 81 Wn.2d 1004 (1972) (holding the same). In the offer of proof Dr. Stanulis was asked the specific question, "Do you have an opinion as to whether she was able to form the specific intent to commit premeditated first degree murder in this case?" Report of Proceedings at 92. Although, in Stanulis's opinion, Bottrell was not able to form specific intent to commit first degree premeditated murder, he offered no opinion about her ability to form an intent to steal from Hall, dead or alive. Rather, he focused solely on Bottrell's state of mind at the time of the killing, when she was reexperiencing via flashbacks past abusive episodes in her life.

Here, if Bottrell suffered from PTSD at the time of Hall's murder, the disorder may have negated the intent necessary for the crime charged, first degree premeditated murder, and for its lesser included offense of second degree murder. Because Dr. Stanulis testified that Bottrell suffered from PTSD, that the PTSD caused flashbacks, and that the flashbacks impaired Bottrell's ability to act with intent, the trial court abused its discretion by excluding Dr. Stanulis's testimony at trial. *See Ellis*, 136 Wn.2d at 523. We reverse this conviction and remand for a new trial on the issue of second degree murder.

## II. FIRST DEGREE FELONY MURDER

First degree felony murder has two elements: (1) a homicide; (2) committed "in the course of or in furtherance of . . . or in immediate flight" from a robbery. RCW 9A.32.030(1)(c). "Robbery" is defined as:

[U]nlawfully tak[ing] personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property[.] . . . Such force or fear must be used to obtain or retain possession of the property, or to prevent

or overcome resistance to the taking[.] . . . Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

RCW 9A.56.190.

 At trial, Bottrell admitted that she had stolen from Hall before. From this admission, the jury could have reasonably inferred that Bottrell intended to steal from Hall again, especially if the jury viewed the admission in conjunction with her statements to fellow inmates: (1) She intended "taking [Hall] for all he had;" (2) if she married Hall and he happened to die from an overdose of insulin, everything would be hers; (3) she had gone over to Hall's house to take money and "stuff"; (4) Hall had resisted and called police; and (5) a fight had ensued and she was glad she had killed Hall. Moreover, after her aborted attempts to clean and to cover up evidence at the crime scene, she and her boyfriend stole Hall's Lincoln Continental, the very car she had previously told a fellow inmate she would take from Hall. Thus, a jury could have reasonably inferred from the evidence that, even before she killed Hall, Bottrell had the requisite intent to commit robbery, the underlying predicate offense for her felony murder conviction. The excluded proffered testimony of Dr. Stanulis would have done nothing to rebut the inference that Bottrell intended to rob Hall.

Although Stanulis's testimony would have reflected on whether Bottrell had the requisite intent to murder, such intent to murder is not an element of felony murder. *State v. Dennison*, 115 Wn.2d 609, 627, 801 P.2d 193 (1990). Rather, the intent required to prove robbery is intent to deprive the victim of property. *State v. Byers*, 136 Wash. 620, 622, 241 P. 9 (1925); *State v. Carter*, 4 Wn. App. 103, 109, 480 P.2d 794, *review denied*, 79 Wn.2d 1001 (1971).

Since the [felony murder] statute does not require the state to prove the intent with which a murder is committed, when it is done in connection with the perpetration of a robbery, mere lack of an intent to rob at the moment of the killing is not a defense.

*State v. Craig*, 82 Wn.2d 777, 783, 514 P.2d 151 (1973).

A homicide is committed in connection with the perpetration of a felony if it is in "close proximity in terms of time and distance between the felony and the homicide and there was no break in the chain of events from the inception of the felony to the time of the homicide." 2 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 150 at 312-14 (15th ed. 1994) (footnotes omitted). That the homicide preceded the final act of the robbery, namely the theft, does not fragment the chain of events. *State v. Temple*, 5 Wn. App. 1, 8, 485 P.2d 93 (1971). It is enough that Bottrell admitted to a cellmate that she went to Hall's house to steal from him, he tried to stop her and called police, and the deadly fight ensued. The other physical evidence is consistent with this explanation by Bottrell.

In determining whether sufficient evidence supports a conviction, "[t]he standard of review is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990) (citing *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). There was sufficient evidence to prove that Bottrell committed felony murder. And Dr. Stanulis's excluded PTSD testimony would not have materially borne on Bottrell's intent to rob Hall.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

HUNT, A.C.J., and MORGAN, J., concur.

Review denied at 143 Wn.2d 1020 (2001).