FILED
COURT OF APPEALS
DIVISION II

2014 JUN 24 AM 9: 01

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43632-9-II |
| Respondent, | |
| v. | |
| DARLENE MARIE GREEN, | PUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Darlene Green appeals her first degree manslaughter conviction based on William Green's death from a gunshot to his face. Green, William's[1] wife of 57 years, initially stated to investigating officers that she shot William after he told her to shoot him. Green later testified that William had shot himself, that she did not recall telling the police she had shot him, and that she could not explain why she told the police that she had done so. After a jury trial, Green was convicted of first degree manslaughter. Green argues that (1) under the corpus delicti rule, there was insufficient evidence independent of her incriminating statements to support her conviction; and (2) the trial court erred in ruling inadmissible under ER 702 an expert's testimony that posttraumatic stress disorder (PTSD) and battered person syndrome could explain why Green initially confessed to shooting William.

We hold that there was sufficient evidence independent of Green's incriminating statements to satisfy the corpus delicti rule. But we further hold that the trial court erred in

---

[1] To avoid confusion, we refer to Darlene Green as "Green" and William Green as "William."

excluding the expert's testimony under ER 702 because his testimony would have been helpful to the jury without invading their function and the *Frye* test does not apply to the expert's opinions. Accordingly, we reverse Green's conviction and remand for a new trial.

## FACTS

*Background*

Green was 81 years old and had been married to William for 57 years. On June 18, 2010, Green called two of her sons and told them she had shot their father. One of the sons later testified that Green did not appear shaken or upset when she told him about the shooting.

Officers responded to the Green residence and found William deceased on the living room floor with a gun next to him. William had a bullet wound between his eyes. Detective Doremus examined the scene. Based on what he observed, he believed that William was leaning over the recliner when he was shot. Doremus observed black markings on William's right hand, suggesting that William was holding the gun with that hand when it discharged.

*Green's Incriminating Statements*

The officers observed Green wearing a blood-covered robe. Green appeared calm and told an officer that William had urged her to shoot him all day and that he had cocked the gun, but that she shot him. Green told another officer, "I don't know what the big deal is. I just did what he told me to." 3 Verbatim Report of Proceedings (VRP) at 281. She also told him that she shot her husband. She said that William knew that she did not know how to load or operate the gun so he loaded it, cocked it, and told her where to shoot him.

After being arrested, Green told Detective Rodrigue that the night before the shooting, she and William had an argument. The next day, while Green was watching television, "out of

the blue" William told her he was going to get his gun so she could shoot him. Clerk's Papers (CP) at 4. Green said that William came back to the living room with his gun, cocked the gun, held it up to his head, and handed it to her. Green said that she then shot him in the head. Rodrigue later testified that Green appeared calm when talking to him.

The State charged Green with second degree murder (Count 1) and, alternatively, first degree manslaughter (Count 2).

*Green's Psychologist Expert*

Green sought to present the expert testimony of Dr. Roland Maiuro, a clinical psychologist, who performed a psychological and forensic evaluation of Green. Green told Dr. Maiuro that she had been a victim of various forms of domestic violence and abuse by William for nearly ten years, since William had begun to experience health problems such as memory difficulties and dementia. Dr. Maiuro found that Green's psychological state and certain physical evidence was consistent with Green being a domestic violence victim. Test results also provided evidence that Green suffered from PTSD.

Dr. Maiuro developed two possible explanations for why Green might say that she shot her husband when she had not. First, he noted that persons in a state of shock sometimes partially dissociate or "step outside of themselves" and then later attempt to piece together what has happened. Suppl. Clerk's Papers (SCP) at 84. Based on what Green observed after the shooting, it may have appeared to her that she did shoot William. Green had reported to Dr. Maiuro, "I guess I thought I did or may have [shot William]. . . . I guess I was in shock. . . . I didn't know what to think. . . . He was lying on the floor dead and I was the only one there."

3

SCP at 84. Dr. Maiuro stated that Green's PTSD symptoms supported the interpretation that the shock of the incident explained her statements.

Second, Green reported to Dr. Maiuro that when William was violent and abusive, she would end up admitting that it was her fault and that she was to blame. Dr. Maiuro stated that the tendency to self blame is a "classically documented symptom of intimate partner abuse and domestic violence victimization." SCP at 85. In Dr. Maiuro's opinion, Green had developed a mindset of inappropriately accepting blame and guilt because of William's severe and repeated abuse.

The State moved to exclude Dr. Maiuro's expert testimony. The trial court ruled that Dr. Maiuro was not permitted to testify regarding Green's "Battered Spouse Syndrome and PTSD insofar as it attempts to explain her inconsistent statements about the shooting." SCP at 104. The trial court stated that Dr. Maiuro's opinion that PTSD might affect Green's perception of the incident was novel, but that even if it was generally accepted in the psychological community, the opinion was unlikely to be helpful to the jury because it was within the common knowledge of a layperson. The trial court also stated that Dr. Maiuro's testimony invaded the jury's duty to determine witness credibility. The trial court did not specifically address Dr. Maiuro's other opinion that because Green had developed battered person syndrome, she was susceptible to accepting blame for something she had not done.

*Forensic Testimony*

Dr. Gina Mary Fino, a medical doctor with specialty training in forensic pathology, performed a forensic autopsy on William. She testified that based on the blood spatter and gunpowder residue, William's right hand must have been in very close proximity to the

cylindrical gap of the gun. She believed it was possible that William had his right hand around the gun cylinder, which was consistent with bruising on that hand. Kathy Geil, a firearm examiner, agreed that William's right hand probably was on the cylinder.

Regarding William's left hand, Dr. Fino testified that based on the blood spatter, that hand would have been in close proximity to the wound. In addition, there was a gap on William's left thumb where there was no blood. Dr. Fino did not explore the cause of this blood gap, and Geil could not determine where William's left hand was at the time of the shooting. Dr. Fino testified that the spatter evidence was consistent with the theory that someone besides William pulled the trigger. Specifically, she did not find anything inconsistent with Green's statement that she shot her husband. On the other hand, Dr. Fino did not rule out the possibility of suicide. She stated that there was no evidence in the autopsy that conclusively pointed to the manner of death.

Detective Doremus testified regarding his opinion of what had occurred. He believed that the left thumb more likely was on the outside of the trigger guard. He testified that if the thumb had been inside the trigger guard, there would have been a void around the entire thumb. The State argued that based on this testimony, William could not have pulled the trigger.

Green called Kay Sweeney, a forensic scientist, to testify. Sweeney agreed that the pattern of blood stains on William's right hand was consistent with his hand being on the cylinder gap of the gun. Sweeney looked at photographs of William's left hand and examined the blood spatter on it. He believed that the presence of a void in the blood staining on William's left hand suggested that William's left thumb was in the trigger guard and on the trigger at the time of blood flow. Green also called Dr. Donald Reay, a forensic pathologist, to testify. He

testified that the blood void on William's left thumb was consistent with the thumb being inside the trigger guard.

*Green's Trial Testimony*

At trial, Green testified that she did not shoot William. She stated that William came out of his bedroom with a gun and asked her to shoot him. She refused and told him to put the gun away. Instead, William stood in front of her, put the gun to his forehead, and told Green to look up. When she looked she saw a big ball of white stars and then William fell onto her legs. Green testified that she never put her hands on the gun.

When asked about her statements following the shooting, Green testified that she did not recall calling her sons or making statements to law enforcement officers. She also stated that she had no recollection of what she told her sons or the officers. Green testified that she could think of no reason why she would tell her sons or the officers that she had shot William.

*Evidence of Domestic Violence*

Green sought to testify about her domestic violence history, arguing that it was relevant to show that shortly before the shooting William was irrational and was acting strange. The State objected, arguing that the testimony had no relation to the shooting and that Green was not asserting self-defense. Green also sought to ask Detective Rodrigue about bite marks and bruises he noted on her body. The State objected under ER 404(b) because such evidence would show Green's state of mind and was irrelevant. Green responded that such evidence was relevant to show how irrational William was such that he took his own life. The trial court excluded this testimony.

No. 43632-9-II

*Suicide Jury Instruction*

Green proposed a jury instruction that stated that if the jury had reasonable doubt about whether or not William committed suicide, then the jury must acquit. Green argued that the instruction was appropriate because William's suicide was an affirmative defense. The State objected to Green's instructions on the basis that (1) it constituted a comment on the evidence, (2) it sounded like a reverse stating of the "to convict" instruction, and (3) the last line, "if you have a reasonable doubt as to whether or not William Green committed suicide, then you must acquit," was not a matter for the jury to decide. 5 VRP at 741. The trial court declined to give Green's proposed instruction.

*Jury Verdict*

The jury found Green not guilty of second degree murder and guilty of first degree manslaughter. Green appeals.

ANALYSIS

A.     CORPUS DELICTI

Green first argues that there was no evidence to support her conviction of first degree manslaughter other than her incriminating statements because testimony showed that William may have committed suicide. We disagree because the State presented independent evidence that supported a reasonable inference of Green's guilt.

1.    Legal Principles

The corpus delicti principle requires that the State prove that some crime actually occurred, which for a homicide involves establishing (1) the fact of death, and (2) a causal connection between the death and a criminal act. *State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d

7

210 (1996). And under the corpus delicti rule, the "defendant's incriminating statement alone is not sufficient to establish that a crime took place." *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006). "[T]he State must present evidence independent of the incriminating statement that the crime a defendant described in the statement actually occurred." *Brockob*, 159 Wn.2d at 328 (emphasis omitted). The purpose of the rule is to prevent a defendant from being unjustly convicted based on an uncorroborated confession. *State v. Dow*, 168 Wn.2d 243, 249, 227 P.3d 1278 (2010).

The corpus delicti rule focuses on the sufficiency of the independent evidence other than the defendant's incriminating statement. *Dow*, 168 Wn.2d at 249, 254. Our review is de novo. *State v. Pineda*, 99 Wn. App. 65, 78, 992 P.2d 525 (2000). In determining the sufficiency of independent evidence under the corpus delicti rule, we assume the truth of the State's evidence and view all reasonable inferences therefrom in the light most favorable to the State. *Aten*, 130 Wn.2d at 658. The independent evidence need not be sufficient to establish that a crime has been committed beyond a reasonable doubt or even by a preponderance of the evidence. *Aten*, 130 Wn.2d at 656. The statement only must provide "prima facie corroboration" of the defendant's statement. *Brockob*, 159 Wn.2d at 328. Prima facie corroboration means that the independent evidence must support a logical and reasonable inference that a crime has occurred. *Brockob*, 159 Wn.2d at 328.

In addition to corroborating the defendant's statement, the independent evidence must be consistent with guilt and inconsistent with a hypothesis of innocence. *Brockob*, 159 Wn.2d at 329. Independent evidence is insufficient to corroborate a defendant's admission of guilt if it

8

supports "reasonable and logical inferences of both criminal agency and noncriminal cause." *Brockob*, 159 Wn.2d at 329 (quoting *Aten*, 130 Wn.2d at 660).

### 2. Independent Evidence

Here, under the corpus delicti rule the State was required to present evidence independent of Green's incriminating statements that she shot William. The State argues that it proved corpus delicti through the following independent evidence: (1) William died of a gunshot wound to the front of his head; (2) Green was covered with blood when the officers arrived; (3) Green did not appear upset or overly emotional after the shooting; (4) William's right hand was wrapped around the gun's cylinder, which would be an unusual way of holding a gun to commit suicide; (5) Detective Doremus testified that the lack of blood spatter on William's left thumb indicated that it was on the outside, not the inside, of the trigger guard; and (6) Dr. Fino testified that the blood spatter evidence was consistent with the theory that someone other than William pulled the trigger. We agree that the testimony of Detective Doremus and Dr. Fino provided sufficient independent evidence that Green shot William.

Initially, we hold that the first four pieces of evidence do not constitute independent evidence that Green shot William. First, the facts that William died of a gunshot wound and that Green was covered with blood are consistent with either homicide or suicide and as a result, they cannot support a reasonable inference of homicide. Second, the fact that Green appeared calm after the shooting may be consistent with her guilt, but it is not inconsistent with her innocence. Third, the State produced no evidence that the way William handled the gun makes it more or less likely that he shot himself, which precludes a reasonable inference that Green shot him.

9

Because these pieces of evidence are not inconsistent with Green's innocence they cannot satisfy the corpus delicti rule. *See Brockob*, 159 Wn.2d at 329.

However, Detective Doremus's testimony that the blood spatter pattern on William's left thumb establishes that his thumb was outside the trigger guard does constitute independent evidence that Green shot William. Assuming that this testimony is true, as we must, William could not have pulled the trigger with his left thumb. And other evidence establishes that he gripped the gun cylinder with his right hand, so he could not have pulled the trigger with that hand. Further, Dr. Fino provided testimony that the blood spatter evidence was consistent with someone other than William pulling the trigger. Because there is evidence that William could not have pulled the trigger, it is reasonable to infer that Green must have shot William.

Green argues that the State did not produce sufficient independent evidence that she shot William because neither of the State's pathology experts could determine whether William's death resulted from homicide or suicide. She relies on *Aten*, where our Supreme Court found insufficient independent evidence when a pathologist determined that a baby's death from acute respiratory failure could have been caused by either sudden infant death syndrome (SIDS) or suffocation. 130 Wn.2d at 659-62. However, in *Aten* the State provided no evidence suggesting that either potential cause of death was more likely, and the court pointed out that SIDS is the leading cause of death for apparently healthy infants. 130 Wn.2d at 659, 661-62. Here, the State did produce testimony that William did not pull the trigger of the gun, which supports a reasonable inference that Green pulled the trigger.

We hold that the State has produced sufficient evidence independent of Green's incriminating statements that she shot William. Accordingly, the State has satisfied the corpus delicti rule.

B. ADMISSIBILITY OF EXPERT TESTIMONY

Green next argues that the trial court erred in excluding under ER 702 Dr. Maiuro's expert testimony that Green's PTSD relating to the shooting incident and her battered person syndrome could explain why Green might have said that she shot William when she did not. We agree.

1. Legal Principles

ER 702 generally governs the admissibility of expert testimony. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011). Under ER 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Expert testimony usually is admissible under ER 702 if it will be "helpful to the jury in understanding matters outside the competence of ordinary lay persons." *Anderson*, 172 Wn.2d at 600. We generally review the trial court's decision whether to admit expert testimony under an abuse of discretion standard. *State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003).

2. Admissibility Under ER 702

The trial court ruled that Dr. Maiuro's opinions were inadmissible under ER 702 because they were within the common knowledge of laypersons and because they involved Green's

credibility, which likely would invade the fact-finding province of the jury. We disagree, and hold that the trial court abused its discretion in excluding Dr. Maiuro's testimony under ER 702.

Multiple cases have held that mental disorders, and specifically PTSD and battered persons syndrome, are beyond the ordinary understanding of laypersons. *See, e.g., State v. Janes*, 121 Wn.2d 220, 236, 850 P.2d 495 (1993); *State v. Ciskie*, 110 Wn.2d 263, 273-74, 751 P.2d 1165 (1988); *State v. Allery*, 101 Wn.2d 591, 597, 682 P.2d 312 (1984); *State v. Bottrell*, 103 Wn. App. 706, 717, 14 P.3d 164 (2000). Here, as the trial court noted, a layperson might understand that a person's perception of a shocking event might be affected by the nature of the situation. But a layperson ordinarily would not understand that PTSD could cause a dissociative state that might result in a person making inaccurate, incriminating statements. Similarly, a layperson ordinarily would not understand that the long-term effects of domestic abuse might cause a victim to accept blame for something he or she did not do. In light of the case law holding that the effects of PTSD and battered person syndrome are beyond the ordinary understanding of laypersons, we hold that the trial court abused its discretion in ruling that Dr. Maiuro's opinions would not be helpful to the jury.

With regard to the second basis for the trial court's ER 702 ruling, the trial court properly was concerned that Dr. Maiuro's testimony could touch on Green's credibility and invade the function of the jury. *See Ciskie*, 110 Wn.2d at 280. In fact, part of Dr. Maiuro's *report* addresses whether Green's present claim that she did not shoot William is credible. Testimony based on this portion of the report is inadmissible. *See State v. Hanson*, 58 Wn. App. 504, 508, 793 P.2d 1001 (1990) (battered person syndrome evidence is inadmissible for the purposes of "general credibility").

12

However, in oral argument of the State's motion to strike, Green's counsel repeatedly emphasized that Dr. Maiuro would *not* testify regarding Green's credibility.

> What I propose him to testify is not whether or not she's telling the truth or she's lying on the stand, which would be an ultimate fact for the jury to figure out, but what the diagnoses and what the syndrome creates, where people who have been battered for a long time tend to take responsibility for things because it's what they've been trained to do because they have been battered.

RP (Jan. 30, 2012) at 13. *This* proposed testimony would not have expressed an opinion regarding Green's credibility or invaded the jury's function. As a result, the trial court abused its discretion in precluding Dr. Maiuro's testimony that PTSD and battered persons syndrome could explain why Green might have made inaccurate incriminating statements.[2]

We hold that Dr. Maiuro's proposed testimony regarding the effects of PTSD and battered persons syndrome would likely help the jury and that when properly limited, his testimony would not invade the jury's function. Accordingly, we hold that the trial court abused its discretion in excluding Dr. Mauiro's testimony under ER 702.[3]

---

[2] The dissent quotes two passages from Dr. Maiuro's *report* that reflect opinions regarding Green's credibility. As noted, we agree that Dr. Maiuro should not be allowed to provide testimony similar to those passages. But the presence of objectionable material in an expert's report does not justify the complete exclusion of that expert's testimony, particularly when counsel disavows any intent to solicit testimony regarding the objectionable material. *Cf. Ciskie*, 110 Wn.2d at 280(approving trial court's decision to admit limited expert testimony on the diagnosis of PTSD, while excluding expert from testifying on inadmissible opinions as to the defendant's credibility).

[3] The trial court also stated without discussion that Dr. Maiuro's testimony was inadmissible because it, "may lend an unduly prejudicial aura of reliability to Defendant's theory of the case." SCP at 103. However, the State does not argue that Dr. Maiuro's testimony was inadmissible on this basis. And the trial court did not explain why Dr. Maiuro's testimony would result in unfair prejudice or give any indication that it undertook any action under ER 403 to balance the probative value of Dr. Maiuro's testimony against any prejudicial effect. The fact that Dr. Maiuro's opinion lends an aura of reliability to Green's theory of the case cannot by itself be the basis for excluding his testimony because that is the purpose of most expert testimony.

3.   Inapplicability of *Frye*

The trial court found that Dr. Maiuro's opinion was novel, but it did not conduct a *Frye*[4] analysis regarding his testimony because it found the testimony inadmissible under ER 702. Nevertheless, the State argues that Dr. Maiuro's testimony is inadmissible because Green did not provide sufficient information to establish admissibility under *Frye*. We disagree that *Frye* applies to Dr. Maiuro's opinions.

If an expert's testimony is based on a novel scientific theory, we employ the *Frye* test to determine whether the testimony is sufficiently reliable to be admissible. *Anderson*, 172 Wn.2d at 600-01. Under this test, we determine whether the theory and the underlying methodology have been generally accepted in the relevant scientific community. *Anderson*, 172 Wn.2d at 601, 603. However, the *Frye* test focuses on general scientific theories, not particular opinions based on those theories. Our Supreme Court has emphasized that, "*Frye* does not require every deduction drawn from generally accepted theories to be generally accepted." *Anderson*, 172 Wn.2d at 611. If an expert's specific opinions are grounded in generally accepted science, *Frye* is not implicated. *Anderson*, 172 Wn.2d at 611-12.

Dr. Maiuro's first opinion is that the PTSD Green experienced as a result of the incident may have caused her to dissociate, which could explain why she initially may have perceived that she did shoot William. There is nothing novel about the PTSD diagnosis. "Washington case law acknowledges that PTSD is recognized within the scientific and psychiatric communities." *Bottrell*, 103 Wn. App. at 715. Further, we recognized in *Bottrell* that psychiatric literature described that some PTSD patients who are subjected to extreme stress, "develop a transient

---

[4] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

dissociative reaction with episodes of depersonalization or derealization," and that, "a person's cognitive or volitional state may be impaired during a dissociative reaction." 103 Wn. App. at 715 (quoting CHESTER B. SCRIGNAR, POSTTRAUMATIC STRESS DISORDER: DIAGNOSIS, TREATMENT, AND LEGAL ISSUES 245 (2d ed. 1988)).

Dr. Maiuro's other theory is that Green suffered from battered person syndrome, which could explain why she might inappropriately accept responsibility for something she did not do. As with PTSD, the diagnosis of battered person syndrome – also known as battered woman syndrome and battered child syndrome – is not novel. *See Janes*, 121 Wn.2d at 233-35; *Allery*, 101 Wn.2d at 596-97. Further, our Supreme Court has recognized that a diagnosis of battered person syndrome can help explain the conduct of a victim that may seem unusual or counterintuitive. *Ciskie*, 110 Wn.2d at 273-74 (expert testimony may be helpful to explain why a battered woman would not simply leave her mate, which is counterintuitive and difficult to understand); *Allery*, 101 Wn.2d at 597 (holding admissible expert testimony explaining why a person suffering from battered woman syndrome would not leave her mate or inform police or friends).

The State acknowledges that the effects of PTSD and battered person syndrome are generally accepted in certain contexts. *See Janes*, 121 Wn.2d at 236 ("evidence of the battered child syndrome is admissible to help prove self-defense"); *Bottrell*, 103 Wn. App. at 718 (testimony concerning PTSD is admissible to show a defendant's ability to act with intent). But the State argues that no case has found that Dr. Maiuro's specific opinions that PTSD and battered persons syndrome could explain why Green might have made incriminating statements are generally accepted in the psychiatric community.

15

Our Supreme Court rejected a similar argument in *Anderson*. In that case, the plaintiff's expert opined that a pregnant woman's exposure to toxic organic solvents caused a particular birth defect. *Anderson*, 172 Wn.2d at 610-11. The defendant argued that the expert's opinion was inadmissible under *Frye* because the specific causal connection between the specific toxic organic solvents to which she was exposed and the specific birth defect was not generally accepted in the scientific community. *Anderson*, 172 Wn.2d at 611. The court disagreed that *Frye* requires general acceptance of "each discrete and ever more specific part of an expert opinion." *Anderson*, 172 Wn.2d at 611. The court stated:

> *Frye* does not require that the *specific conclusions* drawn from the scientific data upon which [the expert] relied be generally accepted in the scientific community. *Frye* does not require every *deduction drawn* from generally accepted theories to be generally accepted.

*Anderson*, 172 Wn.2d at 611 (emphasis added).

Here, as noted above, the theories that PTSD can affect a person's perception and that battered person syndrome can affect a victim's behavior are well established, not novel. Therefore, under *Anderson*, *Frye* does not apply to Dr. Maiuro's specific application of these theories to explain why a person might confess to a crime she did not commit. *See Anderson*, 172 Wn.2d at 611.

We hold that *Frye* is inapplicable to Dr. Maiuro's specific opinions based on PTSD and battered person syndrome. Accordingly, Green's failure to provide information sufficient to satisfy *Frye* is not grounds for precluding that testimony.

C.    DOMESTIC VIOLENCE EVIDENCE

Green challenges the trial court's exclusion of past incidents of William's domestic violence against Green and evidence of the subject of the argument between Green and William

16

the night before the shooting. Because on remand Dr. Maiuro's expert testimony regarding PTSD and battered person syndrome will be admitted, in the new trial the analysis for determining the admissibility of William's prior acts may be different than in the first trial. Accordingly, we will not address this issue. On remand, the trial court will determine anew whether this evidence is admissible.

D.    SUICIDE JURY INSTRUCTION

Green argues that the trial court erred and denied her due process when it refused to give the jury her proposed instruction regarding the defense theory that William committed suicide. We address this issue because it may arise on remand. We reject Green's argument because her proposed instruction did not adequately state the law and the trial court provided a more general instruction that adequately explained the law and allowed each side to argue its theory of the case.

We review a trial court's choice of jury instructions for an abuse of discretion. *State v. Hathaway*, 161 Wn. App. 634, 647, 251 P.3d 253 (2011). Jury instructions are sufficient if substantial evidence supports them, they allow the parties to argue their theories of the case, and they properly inform the jury of the applicable law. *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002). It is reversible error to refuse to give a proposed instruction only if the instruction properly states the law and the evidence supports it. *State v. Ager*, 128 Wn.2d 85, 93, 904 P.2d 715 (1995). "[I]t is not error for a trial court to refuse a specific instruction when a more general instruction adequately explains the law and allows each party to argue its case theory." *Hathaway*, 161 Wn. App. at 647.

Here, Green's proposed jury instruction stated:

> Darlene Green's theory of the case is that her husband William on June 18, 2010 committed suicide in front of her by taking his Ruger Single Six pistol, placing it to his forehead and pulling the trigger thereby ending his life.
> The State has presented you with three alternate theories of their case,
> 1. Darlene intentionally but without premeditation shot her husband which caused his death.
> 2. That Darlene assaulted her husband and by either committing that assault, or fleeing from that assault, caused the death of William.
> 3. Or that Darlene recklessly caused the death of William.
> If you have reasonable doubt as to whether or not William Green committed suicide, then you must acquit Darlene.

2 SCP at 379. We hold that the trial court did not abuse its discretion in refusing to give this instruction for three reasons.

First, the general "to convict" instructions adequately explained the law in this case and allowed each party to argue its case theory. *See Hathaway*, 161 Wn. App. at 647. The trial court instructed the jury that the State had the burden of proving the elements of either second degree murder or manslaughter beyond a reasonable doubt. These instructions allowed Green to argue her theory that the State could not meet this burden because William committed suicide. And in fact Green argued this theory in closing.

Second, the authority Green cited to the trial court in support of her proposed instruction is inapplicable. Green's cases all related to instructions setting forth an affirmative defense, and specifically self-defense. *See State v. Werner*, 170 Wn.2d 333, 336-38, 241 P.3d 410 (2010). However, Green's suicide theory was not an affirmative defense. Green provided no authority for the proposition that a trial court is required to give an instruction that merely sets forth a defendant's argument explaining why he or she did not commit the crime. As the trial court pointed out, such an instruction is akin to a comment on the evidence.

Third, Green's proposed instruction was confusing and did not properly state the law.

No. 43632-9-II

Instructing the jury that it must acquit if there is reasonable doubt as to whether or not William committed suicide creates confusion regarding the burden of proof. The jury could be misled into believing that the State had the burden of proving beyond a reasonable doubt that William did not commit suicide. But that is not an element of the State's case. Or the jury could be misled into believing that Green had the burden of proving that William committed suicide. But Green has no such burden. As a result, the proposed instruction failed to properly state the law and the trial court did not abuse its discretion by refusing to give the instruction.

We reverse Green's conviction and remand for a new trial.

MAXA, J.

I concur:

BJORGEN, A.C.J.

19

HUNT J. (dissenting) — I respectfully dissent from the majority's reversal of Green's conviction and its holding that

> Dr. Maiuro's proposed testimony regarding the effects of [posttraumatic stress disorder] PTSD and battered persons syndrome would likely help the jury and that when properly limited, his testimony would not invade the jury's function [and] the trial court abused its discretion in excluding Dr. Maiuro's testimony under ER 702.

Majority at 13. I would defer to the trial court's exercise of its discretion in excluding this expert testimony; and I would affirm.

ER 403 allows the trial court to exclude relevant evidence "'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003) (quoting ER 403). The law is well settled that (1) a trial court has broad discretion to decide whether evidence is admissible, (2) we generally defer to the trial court's exercise of this discretion, (3) we will reverse a conviction based on evidence admissibility only if the trial court manifestly abused its discretion, and (4) we will not reverse the trial court's exercise of discretion if its reasons for its decision are "'fairly debatable.'" *Cheatam*, 150 Wn.2d at 646-47 (internal quotation marks omitted) (quoting *State v Ward*, 55 Wn. App 382, 386, 777 P.2d 1066 (1989)); *see also Cheatam*, 150 Wn.2d at 645; *State v. Hughes*, 106 Wn.2d 176, 201, 721 P.2d 902 (1986). In my view, Green has not demonstrated a manifest abuse of discretion here.

The majority treats ER 403 as irrelevant because the trial court did not mention ER 403 or undertake a balancing analysis on the record. Majority at 13, n.3. I respectfully disagree for three reasons. First, that the trial court did not expressly mention ER 403 does not defeat its

application here; ER 403 does not require a trial court to conduct a balancing analysis on the record. *State v. Baldwin*, 109 Wn. App. 516, 528, 37 P.3d 1220 (2001), *review denied*, 147 Wn.2d 1020 (2002). Second, here, the trial court did balance the substantive value of the evidence against the danger of unfair prejudice in the following manner: The trial court acknowledged that Dr. Maiuro's testimony was relevant, but ruled that because the testimony "clearly bears on Defendant's credibility, it is likely to invade the fact-finding province of the jury" that would lend an "unduly prejudicial aura of reliability" to Green's theory of the case. Suppl. Clerk's Papers (SCP) at 102, 103. Third, even if the trial court had not engaged in an ER 403 balancing analysis, in the absence of a manifest abuse of discretion, we may affirm the trial court on any ground that the record supports. *State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004) (citing *In re Marriage of Rideout*, 150 Wn.2d 337, 358, 77 P.3d 1174 (2003)). Such is the case here.

The following factors weighed by the trial court show both that it engaged in the proper balancing analysis and that it did not manifestly abuse its discretion in so doing. The trial court expressed legitimate concerns that Dr. Maiuro's testimony would unduly prejudice the jury, especially given that courts do not admit evidence of battered woman syndrome for purposes of "general credibility." *State v. Hanson*, 58 Wn. App. 504, 508, 793 P.2d 1001, *review denied*, 115 Wn.2d 1033 (1990) (internal quotation marks omitted). Although Green asserted that Dr. Maiuro was not going to testify about credibility, the following excerpts from Dr. Maiuro's report show that his testimony would reflect on Green's credibility in conjunction with her conflicting statements, a key issue in the case: (1) "Green's current rendition of events and claim that she did not shoot her husband, and that he must have died by his own hand, appears to be

21

*credible*"; and (2) "[t]he fact that she said, or may have initially thought, she was responsible for the shooting, does not necessarily mean that her current, more considered, assertion that she did not is not *credible*." SCP at 83, 84 (emphasis added).

The law is also well settled that determinations of credibility are solely for the jury. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004) (citing *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)). Thus, in exercising its broad discretion to admit and to exclude relevant evidence, it is a paramount duty of the trial court to protect the jury from invasion into its exclusive realm of deciding witness credibility, especially when assessing whether expert testimony can assist the jury in making determinations in areas beyond the common understanding of a layperson.[5] *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn 2d 593, 600, 260 P.3d 857 (2011). Majority at 12. Here, the record shows that, in the process of explaining why Green may have offered conflicting statements at different times about whether she had shot her husband, Dr. Maiuro's testimony would inevitably have reflected on Green's credibility. Given the applicable standards of review, how can we say that the trial court "manifestly abused its discretion" when the trial court excluded Dr. Maiuro's testimony based on its concerns that such testimony would bear on Green's credibility, a factual issue solely for the jury?

I would uphold the trial court's carefully reasoned exclusion of Dr. Maiuro's testimony based on its determination that the danger of undue prejudice to the jury's credibility

---

[5] *See, e.g.*, *Cheatam*, 150 Wn.2d at 649 ("[T]he trial court must carefully consider whether expert testimony on the reliability of eyewitness identification would assist the jury in assessing the reliability of eyewitness testimony.")

No. 43632-9-II

determinations substantially outweighed the relevance of such testimony. Even if we might have allowed such evidence if anyone of us had been the trial court, this trial court's exclusion of the evidence is not grounds for reversal of Green's conviction. Again, I would affirm.

Hunt, J.