IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83157-7-I |
| Respondent, | DIVISION ONE |
| v. | |
| DAVID LEE MORRIS, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — A jury convicted David Lee Morris of murder in the first degree with a deadly weapon enhancement for stabbing his former girlfriend, Gabrielle Garcia, in a food court in front of their five-year-old son. On appeal, Morris contends the trial court erred by (1) excluding testimony of an expert witness in violation of his right to present a defense, (2) overruling his GR 37 challenge, (3) conducting voir dire via Zoom, (4) denying his motion for mistrial, (5) giving a first aggressor jury instruction, (6) imposing an exceptional sentence, and (7) imposing a victim penalty assessment and DNA fee. Finding no error, we affirm the conviction. However, we remand for Morris to move to have the victim penalty assessment and DNA fee stricken.

FACTS

Background

David Lee Morris and Gabrielle Garcia met online and began dating in May 2012. Shortly thereafter, Garcia became pregnant. She gave birth to their son, G.M., in February 2013. At that time, Morris was an infantryman in the Army

and deployed in Afghanistan; he was still stationed there when G.M. was born. Although Morris and Garcia had been engaged when he deployed, they separated shortly after he returned in June 2013. In early 2014, Morris was stationed in Germany and stayed there until June 2015, when he was honorably discharged for unsatisfactory performance. After leaving the Army, Morris moved in with his mother in Texas.

In March 2016, Morris and Garcia began dating again and Garcia moved to Texas with G.M. to be with Morris. Six months later, they separated again and Garcia moved back to Seattle with G.M. After her return to Seattle, Garcia hired a lawyer to write a parenting plan so that she could maintain custody of G.M.

In the meantime, Morris became fixated on getting back together with Garcia, and his behavior toward her quickly escalated into obsession, harassment, and hatred. Morris was particularly jealous of Garcia's relationships with other men and he believed that her alleged promiscuity was harming G.M. Garcia started to limit her communication with Morris, and began relying on her father, Joe Garcia, as an intermediary. Despite this, Morris continued to inundate Garcia and her father with threatening text messages and e-mails.[1] By August

---

[1] For example, in February 2018, Morris sent the following text message to Garcia's father: "And so help me God if I see [G.M.] sitting in that strangers [sic] lap. I am tired of no say. . . . Gabby can [sleep with] half of Seattle, but this bullshit ends now sir." And in August 2018, Morris sent the following text message to Garcia's father: "I hope her cheating and avoidance due to cowardice was worth it. Three bfs in 1 year and my son has no father. . . . You have no idea how hard I've fought to keep myself from taking revenge. . . . If there is a God, may you all burn in hell."

2018, Morris's messages became even more troubling—he threatened suicide and claimed that G.M. would be "better off in foster care" than with Garcia.

In September 2018, a parenting plan was entered giving Garcia full custody of G.M. and permitting Morris to have limited phone contact and in-person visits. In October 2018, Garcia obtained an anti-harassment order to restrain Morris from continuing to contact her. The same day that the anti-harassment order was issued, Morris e-mailed Garcia about his plans to visit G.M. in Seattle. In the e-mail, he also threatened to surveil Garcia and to convey inappropriate information about her to G.M.

After a hearing in late October 2018, a permanent anti-harassment order was entered against Morris. Morris was in Seattle at that time for a scheduled visit with G.M. Unbeknownst to Garcia, Morris had been fired from his job in Texas and had planned to stay in Seattle and sleep in his car until he found work in the city.

On November 1, following a barrage of messages from Morris, Garcia reported to her lawyers and to law enforcement that Morris had violated the anti-harassment order.

On November 2, 2018, Garcia and G.M. were scheduled to meet Morris at Seattle Center for a visit. That morning, Garcia's lawyers had e-mailed Morris about his violation of the anti-harassment order and cautioned him to follow the order; Morris responded in an agitated and angry manner. Around 3:30 p.m., Garcia met Morris at the Pacific Science Center. Morris tried to talk to Garcia about their relationship but Garcia refused, and Morris got upset.

3

Garcia and Morris eventually left the Science Center and headed to the food court located in the Armory. At the Armory, Garcia ordered a cheese pizza at MOD Pizza for G.M. While she was ordering, G.M. came to the counter and asked Garcia to buy him a treat. When Garcia told G.M. that he needed to eat his pizza first, G.M. became upset and started yelling. Morris came over and told Garcia to "[j]ust buy [G.M.] the cake." Garcia, Morris, and G.M. then proceeded to a table to eat the pizza.

Minutes later, several Armory employees and food court patrons heard Garcia scream and witnessed Morris pinning her up against the wall, stabbing her repeatedly in the neck. G.M. was less than three feet away. Morris quickly left the building. Bystanders tried to save Garcia's life by applying pressure to her neck with towels and clothing but she later died in surgery at Harborview Medical Center.

Outside the Armory, a witness approached Morris, drawing his firearm to keep Morris from fleeing. Other witnesses told Morris to drop the knife, and Morris repeatedly told them that he had killed the woman he loved and asked that they shoot him. Another passerby pepper sprayed Morris.

Police arrived on the scene and subdued Morris. Morris immediately began to tell officers that he had murdered Garcia. Officers advised Morris of his Miranda[2] rights. Morris continued to relay details about the murder to officers, telling them that he "was trying to make her death quick" but that if Garcia

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

survived, she'd "probably use this to victimize herself the rest of her life."  When a responding officer asked Morris if he understood why he'd been arrested, Morris replied: "Well, let's see here, I mean, I'm covered in blood from killing the woman I love for taking my son.  I think it might be attempted murder, or possibly murder depending if she dies."

Morris was transported to an interview room at the Seattle Police Department headquarters and read his Miranda rights again.  When left alone in the interview room, Morris started talking to himself about the stabbing.  He ranted that he wanted "revenge" against Garcia, that she was "evil" for having an abortion, that she was promiscuous, and that she "deserved to die."  When the detective returned, Morris spoke freely for several hours about his relationship problems with Garcia and his motivations for killing her.  Morris told the detective that he debating killing Garcia and ultimately decided that G.M. would be better off being raised by another family.  Morris also acknowledged that his son was likely traumatized; he stated that he hoped his son would either repress the events or "eventually get over it with therapy."  Throughout the interview, Morris fixated on Garcia's relationships with other men and what he perceived to be promiscuity as a justification for killing her.

Morris also provided the detective a detailed account of his plan for killing Garcia.  He told the detective that when he first got to the Science Center, he had "briefly thought about just taking her out right there, taking it and knifing her."  Morris stated that he had "remembered all the horrible things [Garcia] had done, and how much had been cut out of [his] life."  Once they got to the food court,

5

Morris told the detective that he "was really starting to let out [his] anger at her." He called Garcia a "whore" and told her she was being a "coward" about her anxiety. Morris also told the detective that he started seriously thinking about killing Garcia several months earlier, in April or May.

Morris explained that when Garcia got up to use the restroom, he thought she was going to call her lawyer and report him for violating the anti-harassment order. He decided then to act. Morris told the detective: "Like, okay, that's it. She's just gonna go tell some other people; I'm getting cut out of my son's life. I'm, like, all right . . . . I'm taking her out for this. I'm not going to let her get away with anything else." Morris then explained how he pulled out his knife, confronted Garcia, and started stabbing her. Morris claimed that he was "trying to be humane" and "kill her quickly," but that "no plan is perfect."

Morris was later charged with murder in the first degree with a deadly weapon enhancement. The State also alleged several aggravating factors, including that it was a crime of domestic violence, that Morris had committed it within the sight or sound of his minor child, and that the crime had a destructive and foreseeable impact on persons other than Garcia.

<u>Pre-Trial Motions and Trial</u>

Morris's initial defense was one of insanity. He claimed that he suffered a post-traumatic stress disorder (PTSD)-induced flashback that made it impossible for him to discern that he was stabbing Garcia and not a burka[3]-clad woman he'd

---

[3] A burka is a loose enveloping garment that covers the face and body and is worn in public by certain Muslim women.

encountered while deployed Afghanistan. Before trial, the State moved to exclude Morris's expert witness, Dr. Mark Whitehill, on the grounds that Dr. Whitehill was unable to testify that Morris's mental disorder met the requirements for a defense of insanity or diminished capacity. The trial court granted the motion, reasoning that because Dr. Whitehill concluded that neither defense was available to Morris, the testimony was irrelevant.

At trial, Morris proceeded on a theory of self-defense. He testified that he experienced a PTSD-induced flashback that led him to believe Garcia was a burka-wearing woman from whom he needed to protect himself and G.M. He claimed that his confessions to police were lies.

The jury rejected Morris's self-defense claim and convicted him as charged. The State requested an exceptional upward sentence, while Morris requested an exceptional downward sentence. The court imposed an exceptional upward sentence of 464 months. Morris appeals.

## ANALYSIS

### Exclusion of Expert Testimony and Right to Present a Defense

Morris asserts that the court erred in excluding expert testimony of Dr. Whitehill as irrelevant and that this error infringed on his constitutional right to present a defense. He maintains that Dr. Whitehill should have been allowed to testify about his PTSD and autism diagnoses because the testimony was relevant to Morris's insanity and diminished capacity defenses and theory of self-defense. He also asserts that this error led to other lay witnesses being wrongly excluded. We disagree. Because Dr. Whitehill could not testify that Morris met

7

the elements of either diminished capacity or insanity, the testimony was irrelevant and the court did not err by excluding it. And because Morris never asked the court to admit Dr. Whitehill's testimony in support of his self-defense theory, the court never ruled on whether the testimony was admissible for that purpose. We also conclude that Morris's right to present a defense was not violated, as Morris was still able to present his theory of the case and could have sought to introduce expert testimony related to self-defense.

We apply a two-step standard of review to determine whether an evidentiary ruling violates a defendant's Sixth Amendment right to present a defense. State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). First, we review the trial court's evidentiary ruling for an abuse of discretion. State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). If the ruling constitutes an abuse of discretion, we apply a harmless error analysis. Jennings, 199 Wn.2d at 59. If the error was not harmless, our analysis ends here. Jennings, 199 Wn.2d at 59.

Second, if no abuse of discretion occurred, or if the abuse of discretion was harmless error, we review de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. Jennings, 199 Wn.2d at 58-59.

1. Exclusion of Dr. Whitehill's Testimony

We review a trial court's determination on the admissibility of expert testimony for an abuse of discretion. Arndt, 194 Wn.2d at 798. A court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable

8

grounds or for untenable reasons. State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007).

Expert testimony is admissible under ER 702 if (1) the witness qualifies as an expert, and (2) the testimony is helpful to the trier of fact. L.M. v. Hamilton, 193 Wn.2d 113, 134, 436 P.3d 803 (2019). A witness may qualify as an expert by knowledge, skill, experience, training, or education. ER 702. Expert testimony is helpful if it concerns matters outside the common knowledge of laypersons and is not otherwise misleading. State v. Groth, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). Only relevant testimony is helpful to the jury. State v. Atsbeha, 142 Wn.2d 904, 917-18, 16 P.3d 626 (2001). Testimony is relevant if it tends to make the existence of any fact of consequence more or less probable than it would be without the evidence. ER 401. Irrelevant evidence is not admissible. ER 402.

### a. Insanity and Diminished Capacity Defenses

Here, Morris's primary defenses were that of insanity and diminished capacity. To establish insanity, he needed to prove that at the time of the murder, his mental condition prevented him from appreciating the nature, quality, or wrongfulness of his actions. RCW 9A.12.010; State v. Box, 109 Wn.2d 320, 322, 745 P.2d 23 (1987). To establish diminished capacity, he needed to show that the alleged condition demonstrably impaired his ability to form the requisite mental intent to commit the charged crimes. State v. Thomas, 123 Wn. App. 771, 779, 98 P.3d 1258 (2004). A mental disorder may amount to insanity and also have a specific effect on the defendant's capacity to achieve a culpable

9

mental state but diminished capacity does not necessarily follow from insanity. State v. Gough, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989).

In order for an expert's testimony to be helpful where a defendant raises an insanity or diminished capacity defense, it is not enough that the defendant be diagnosed as suffering from a particular mental condition. State v. Greene, 139 Wn.2d 64, 73-74, 984 P.2d 1024 (1999). Rather, "[t]he diagnosis must, under the facts of the case, be capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime." Greene, 139 Wn.2d at 74. "The opinion concerning a defendant's mental disorder must reasonably relate to impairment of the ability to form the culpable mental state to commit the crime charged." Atsbeha, 142 Wn.2d at 921. "Under this standard, it is not necessary that the expert be able to state an opinion that the mental disorder actually did produce the asserted impairment at the time in question— only that it could have, and if so, how that disorder operates." State v. Mitchell, 102 Wn. App. 21, 27, 997 P.2d 373 (2000).

For example, in Mitchell, the defendant was charged with third degree assault after punching a police officer. 102 Wn. App. at 23. In a pretrial hearing, the defendant's expert testified that, at the time of the offense, the defendant suffered from paranoid schizophrenia, a disorder capable of diminishing his capacity to know that the individuals he was interacting with were police officers. Mitchell, 102 Wn. App. at 26. But the expert could not say with reasonable certainty that the defendant's mental disorder actually caused his capacity to be diminished at the time of the incident, only that it was possible. Mitchell, 102 Wn.

10

App. at 26. The trial court excluded the testimony, concluding that an explanation of the disorder would only confuse the jury and invite them to speculate unless the expert could affirmatively state that the defendant's disorder was actually affecting his conduct at the time of the incident. Mitchell, 102 Wn. App. at 27. On appeal, this court concluded that the trial court erroneously excluded the expert's testimony because it would have helped the jury understand the dynamics of the defendant's mental disorder and helped explain an otherwise bizarre incident. Mitchell, 102 Wn. App. at 26-27. The court noted that the "jury should be allowed to determine whether Mitchell was experiencing delusions at the time of his arrest even if [the expert] could only say it was possible." Mitchell, 102 Wn. App. at 28.

In contrast, in Greene, our Supreme Court concluded that the trial court properly excluded expert testimony concerning the defendant's dissociative identity disorder (DID) as irrelevant because, given the state of the relevant science at the time, "it was not possible to reliably connect the symptoms of DID to the sanity or mental capacity of the defendant." 139 Wn.2d at 79. The court explained that there were various approaches to determining whether an individual suffering from DID was legally insane at the time of committing the offense, but that "none of the various approaches ha[d] been accepted as producing results capable of reliably helping to resolve questions regarding sanity and/or mental capacity in any legal sense." Greene, 139 Wn.2d at 77.

Here, Dr. Whitehill diagnosed Morris with PTSD and autism. Dr. Whitehill concluded that Morris's PTSD manifested in the following ways: anxious arousal

11

(e.g., worrying about things); depression (e.g., feeling empty inside); intrusive experiences (e.g., nightmares or bad dreams); and defensive avoidance (e.g., trying to block out certain memories). Dr. Whitehill noted that Morris tested very well on a screen for neurological difficulties, placing him in the range of "[v]ery low probability of impairment." As to Morris's ability to tell right from wrong, Dr. Whitehill opined that there was no evidence to support Morris's assertion that he suffered a PTSD-induced flashback and that Morris's subsequent justifications for stabbing Garcia undercut his claim that he had experienced a flashback. As to Morris's capacity to understand the nature and quality of the acts committed, Dr. Whitehill opined that "there is no question that Mr. Morris was aware that he was stabbing." Dr. Whitehill noted that this conclusion was also supported by Morris's statements to police and his musings about the murder when left alone in the interview room.

As to Morris's defense of diminished capacity, Dr. Whitehill opined that such a defense was not warranted regardless of whether Morris experienced a PTSD-induced flashback or not because Morris intended to stab someone either way.

On these facts, the trial court did not err in excluding Dr. Whitehill's testimony as it related to Morris's defenses of insanity or diminished capacity. Dr. Whitehill's conclusion that Morris had the capacity to understand the nature of his actions is fatal to Morris's claim that the testimony was relevant. Even if Dr. Whitehill testified that it was possible Morris experienced a flashback that impeded his ability to tell right from wrong, Dr. Whitehill could not testify that

Morris lacked the capacity to understand the nature and quality of his actions. Similarly, regardless of whether Morris experienced a flashback or not, Dr. Whitehill could not testify that he lacked the intent to commit the offense. Because Dr. Whitehill could not reliably connect the symptoms of Morris's PTSD diagnosis with insanity or diminished capacity, the trial court properly excluded the testimony as irrelevant.

### b. Self-Defense

Morris also argues that Dr. Whitehill's testimony was relevant to his theory of self-defense. He contends that Dr. Whitehill should have been able to testify as to his diagnoses of PTSD and autism and that the exclusion of Dr. Whitehill as a witness led to other witness's testimony being erroneously excluded. But because Morris did not ask the court to admit Dr. Whitehill's testimony to support his self-defense claim, the court did not rule on whether it was admissible. Therefore, this issue is not properly before this court.

In general, mental disorders, such as PTSD, are beyond the ordinary understanding of laypersons and require explanation via expert testimony. State v. Green, 182 Wn. App. 133, 146, 328 P.3d 988 (2014). For example, a layperson might not understand that PTSD can induce a host of lesser known effects, like a dissociative state or a flashback. Green, 182 Wn. App. at 146-47; State v. Bottrell, 103 Wn. App. 706, 715, 14 P.3d 164 (2000).

Here, after the court excluded Dr. Whitehill's testimony as to insanity and diminished capacity, Morris pursued a theory of self-defense. In support of this theory, Morris planned to elicit testimony from jail health staff and Seattle Police

Officer Brian Muoio that Morris was experiencing PTSD symptoms after the murder. During motions in limine, the State moved to exclude testimony of the jail health staff, contending it was inadmissible without supporting expert testimony about PTSD. Defense counsel had the following colloquy with the court about the jail health staff witnesses:

> [DEFENSE]: There is no evidentiary requirement. This is not a diminished capacity defense. And there's no evidentiary requirement that we present a mental health expert witness for Mr. Morris to be able to testify about PTSD or his subjective flashback.
>
> . . . .
>
> I think there would be some minimal observations about Mr. Morris's demeanor in their interactions.
>
> The jail health staff would likely testify about their actions in relation to Mr. Morris—
>
> [COURT]: Well, let's—before we move onto actions, what about the demeanor and how does it relate to the events at issue in this case?
>
> [DEFENSE]: So, Mr. Morris's demeanor when he was relating symptoms of mental health to them; whether or not his demeanor, I guess, was consistent with his recounting of any mental health symptoms.
>
> [COURT]: But, do I understand correctly that you are not going to be calling these witnesses with respect to any kind of diagnosis or any other expert opinion?
>
> [DEFENSE]: There will be no expert opinion.

Before the court ruled on the admissibility of the jail health staff testimony, it followed up with defense counsel about expert testimony:

> [COURT]: Just to confirm: you're not going to be asking any witness for a diagnosis or any other medical opinion; is that correct?
>
> [DEFENSE]: We are not asking for any medical opinion, and I think it's safe to say we're not going to ask them to opine about his diagnosis.

14

The court then excluded the testimony of the jail health staff, reasoning that Morris needed to proffer an expert opinion to support his PTSD diagnosis before lay witnesses could testify about his PTSD. The court also noted that Morris could move for reconsideration of the court's ruling if Morris was able to provide additional evidence that would directly link his PTSD diagnosis to his self-defense claim.

Later at trial, the State objected to the admission of Officer Muoio's testimony about PTSD, arguing that it lacked foundation without underlying expert testimony about Morris's PTSD diagnosis. The court agreed, explaining that expert testimony was needed to establish an adequate foundation as to Morris's diagnosis.

The court did not err in excluding the jail health staff or officer's testimony on the basis that such testimony lacked foundation. It is well-established that the intricacies of a PTSD diagnosis are outside the understanding of laypeople. Thus, Morris needed to provide expert testimony as to his PTSD diagnosis before proffering lay witness testimony as to the same. But because Morris never asked the court to rule on the admissibility of Dr. Whitehill's testimony as it related to self-defense, the court did not rule on whether the testimony was admissible for that purpose and no ruling exists about the exclusion of an expert witness for us to review on appeal.

2. Right to Present a Defense

Because the court did not err in excluding Dr. Whitehill's testimony as it related to Morris's insanity and diminished capacity defenses, we next consider

15

whether the exclusion of the testimony violated Morris's right to present a defense. We conclude that it did not.

Criminal defendants have a right to present a defense guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22; Jennings, 199 Wn.2d at 63. But this right is not absolute; for example, defendants only have a right to present relevant evidence, not irrelevant evidence. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). And when a defendant has an opportunity to present their theory of the case, the exclusion of some aspects of their proffered evidence is not a violation of their constitutional right to present a defense. State v. Ritchie, 24 Wn. App. 2d 618, 635, 520 P.3d 1105 (2022), review denied, 1 Wn.3d 1005, 526 P.3d 851 (2023).

Here, Morris contends that he was "forbidden from eliciting any corroborating testimony about his mental state at the time of the stabbing." This is inaccurate. Although the court excluded Dr. Whitehill's testimony for the purposes of Morris's insanity and diminished capacity defenses, it did not prevent Morris from presenting another expert to testify about how his PTSD diagnosis related to his theory of self-defense. Rather, the court repeatedly asked Morris's counsel if it would like to proffer expert testimony as to PTSD and Morris's counsel expressly told the court that they did not plan to offer such expert testimony. Without expert testimony to properly explain the PTSD diagnosis, lay witness testimony about Morris's PTSD-related symptoms was inadmissible and properly excluded. Green, 182 Wn. App. at 146 (expert testimony needed to explain PTSD); ER 701 (lay witness testimony cannot be based on scientific or

other specialized knowledge). We conclude that Morris's right to present a defense was not violated.

## GR 37 Challenge

Morris contends that the State engaged in a pattern of gender discrimination in violation of GR 37 by using seven of its eight peremptory strikes against men. He also argues that the court incorrectly applied Batson[4] by (1) not requiring the State to articulate a gender-neutral reason for striking each of the seven jurors, and (2) not assessing whether an objective observer could view gender as a factor for each of the seven peremptory challenges, only the one challenge that Morris objected to. We disagree that GR 37 applies to gender-based challenges. We also disagree that the court found that a pattern of discrimination existed; therefore, the State did not need to articulate a gender-neutral reason for the previous jurors. And because the State set forth a gender-neutral reason for striking the challenged juror, we conclude that the court did not err in overruling Morris's GR 37 challenge.

### 1. Waiver

As a preliminary matter, we must determine whether Morris properly preserved this issue for review. The State maintains that Morris did not ask the trial court to reconsider its first six peremptory challenges nor did he request that the court apply an objective observer standard to the first six peremptory challenges and that these arguments are waived on appeal. We disagree.

---

[4] Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

17

In general, we will not consider issues raised for the first time on appeal. RAP 2.5(a). Here, Morris objected to the State's alleged pattern of excluding male jurors. This objection also preserved Morris's argument that the court failed to apply the right standard to each of the challenges. By highlighting what he asserted to be a pattern and specifying the number of stricken jurors, Morris implicitly challenged each of the State's earlier peremptory challenges against men. The argument was not waived.

2. GR 37 and Gender Bias

We now turn to Morris's GR 37 argument and first address whether GR 37 applies to claims of gender discrimination. We conclude that it does not.

Our federal and state constitutions guarantee criminal defendants the right to a trial by impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. In furtherance of this right, parties may exercise for cause and peremptory challenges to excuse potentially unfit jurors. RCW 4.44.130. However, peremptory challenges may not be used to exclude potential jurors on the basis of race or ethnicity. Batson, 476 U.S. at 91.

When an objection to the use of a peremptory challenge is raised, the court applies the three-step Batson test. First, the party challenging the strike must make a "prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94. Second, if a prima facie case is made, the burden shifts to the striking party to provide an adequate, race-neutral justification for the strike. City of Seattle v. Erickson, 188 Wn.2d 721, 726-27, 398 P.3d 1124

18

(2017).  Third, if the party making the strike provides a race-neutral reason, the court must then weigh all the relevant circumstances to decide if the proffered reasons are pretextual and give rise to an inference of discriminatory intent. Batson, 476 U.S. at 97-98; Flowers v. Mississippi, 588 U.S. __, 139 S. Ct. 2228, 2241, 204 L. Ed. 2d 638 (2019).  "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' "  Rice v. Collins, 546 U.S. 333, 388, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (quoting Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (per curiam)).  On review, we afford "a high level of deference to the trial court's determination of discrimination" and the trial court's decision will only be reversed if the appellant can show it was clearly erroneous.  State v. Hicks, 163 Wn.2d 477, 493, 181 P.3d 831 (2008); Erickson, 188 Wn.2d at 727.

In the early 1990s, this court and the Supreme Court extended Batson's application to gender-based discrimination in the use of peremptory challenges. State v. Burch, 65 Wn. App. 828, 830 P.2d 357 (1992); J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994).

In 2017, recognizing the shortcomings of the Batson test in addressing racial bias in jury selection, our State Supreme Court adopted GR 37, which modifies the third Batson step.  Instead of the court determining whether a challenge was motivated by racial animus, GR 37 requires the court to assess whether "an objective observer could view race or ethnicity as a factor in the use

of the peremptory challenge." GR 37(e). The rule defines an "objective observer" as someone who is "aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f). If the court finds that an objective observer could view race or ethnicity as a factor, the peremptory challenge must be denied. State v. Jefferson, 192 Wn.2d 225, 249, 429 P.3d 467 (2018). But although GR 37 expands the Batson test, the rule is limited to bias and discrimination based on race and ethnicity. State v. Brown, 21 Wn. App. 2d 541, 552, 506 P.3d 1258, review denied, 199 Wn.2d 1029, 514 P.3d 641 (2022).

Here, Morris's assertion that Jefferson expanded the GR 37 framework to include gender is unavailing. The Jefferson court did not consider whether GR 37 applied to gender and did not state that GR 37 applied to all discrimination traditionally subject to Batson. Rather, the court's analysis was explicitly limited to race and ethnicity. See Jefferson, 192 Wn.2d at 239 ("Our current Batson test does not sufficiently address the issue of *race* discrimination in juror selection." (emphasis added)). And the court was clear as to the purpose of GR 37: "The evil of *racial* discrimination is still the evil this rule seeks to eradicate." Jefferson, 192 Wn.2d at 249 (emphasis added). No case since Jefferson has applied GR 37 in a gender discrimination context. See, e.g., State v. Listoe, 15 Wn. App. 2d 308, 333 n.21, 475 P.3d 534 (2020) (Melnick, J., concurring) ("In addition, even though GR 37 is not applicable to peremptory challenges that implicate gender-based discrimination, Batson applies."); Brown, 21 Wn. App. 2d at 554

("Jefferson's test was explicitly limited to race and ethnicity. . . . GR 37 does not apply to gender or any other protected status covered by the equal protection clause and our state constitution.").

Moreover, the final report on GR 37 makes clear that the rule does not apply to gender.  See PROPOSED NEW GR 37—JURY SELECTION WORKGROUP, FINAL REPORT.[5]  The report explicitly states that GR 37 does not apply to issues of gender and sexual orientation because the workgroup had not yet discussed those categories or classifications.  FINAL REPORT at 5.  The workgroup members "agreed that while gender and sexual orientation should be included in the proposed rule at a later time after thoughtful consideration, in order to meet the court's requested time frame and objective, it was necessary to postpone further discussion on gender and sexual orientation."  FINAL REPORT at 5.  We are unconvinced that GR 37 applies to gender-based challenges and conclude that the objective observer standard does not apply in the present case.

3.  Application of *Batson*

Because the objective observer standard does not apply here, Morris's claim of gender discrimination is properly analyzed under the traditional Batson test.  Under that test, we conclude that Morris fails to prove that the strikes were motivated by gender-based animus.[6]

---

[5]  https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/OrderNo25700-A-1221Workgroup.pdf

[6]  We note, too, that most cases addressing gender bias in jury selection focus on the exclusion of female jurors, not male jurors.  See, e.g., Burch, 65 Wn. App. at 837 (concluding that gender-based peremptory challenges are an obvious denial of female jurors' equal rights); Brown, 21 Wn. App. 2d at 555-56

As discussed above, once a <u>Batson</u> challenge is raised, the court applies a three-part test. First, the objecting party must demonstrate a prima facie case of purposeful discrimination. <u>Burch</u>, 65 Wn. App. at 840. This prong is met by showing that the peremptory challenge was exercised against a member of a constitutionally protected group and that "other relevant circumstances" raise an inference that the challenge was based on that group membership. <u>Batson</u>, 476 U.S. at 96. Relevant circumstances can include a " 'pattern' " of strikes against a particular constitutionally cognizable group. <u>Burch</u>, 65 Wn. App. at 840 (quoting <u>Batson</u>, 476 U.S. at 96-97). But "a 'pattern of strikes' is only found when '[t]he strikes . . . affect those members to such a degree *or with such a lack of apparent nonracial explanation as to suggest the possibility of racial motivation*.' " <u>State v. Wright</u>, 78 Wn. App. 93, 102, 896 P.2d 713 (1995) (quoting <u>People v. Hope</u>, 137 Ill.2d 430, 462-63, 560 N.E.2d 849, 168 Ill. Dec. 252 (1990)).

Second, if the objecting party establishes a prima facie case, the burden then shifts to the striking party to provide a gender-neutral reason for striking the juror. <u>Burch</u>, 65 Wn. App. at 840. The neutral explanation must be "clear and reasonably specific." <u>Batson</u>, 476 U.S. at 98 n. 20 (quoting <u>Texas Dep't of Cmty. Affs. v. Burdine</u>, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). Finally, the court must determine from the totality of the circumstances whether the objecting party has established purposeful discrimination. <u>Jefferson</u>, 192 Wn.2d at 232. Because these findings depend on the court's determination of

---

(examining exclusion of female jurors for gender bias); <u>but cf.</u> <u>J.E.B.</u>, 511 U.S. at 130 (determining that use of peremptory challenges to remove all male jurors from venire was discriminatory).

the credibility of the attorneys and jurors, we review them for clear error.  Brown, 21 Wn. App. 2d at 558.

At the outset, we acknowledge that the trial court engaged in these steps out of order.  Nevertheless, we agree with the court's determination that Morris failed to carry his burden of proving purposeful discrimination.

After Morris alleged that the State engaged in a pattern of gender discrimination by striking male jurors, the court immediately asked the State to articulate a gender-neutral reason for striking juror 115, the last juror in the alleged pattern.  The State explained that the juror indicated he received his news from a far-right, libertarian blog that had been banned in some countries for its extremist views and from a "Russian State controlled international television network."  Morris then offered additional argument as to why he believed a pattern of discrimination existed.  The court overruled the challenge.  A while later, the State reminded the court that it had not yet ruled as to whether Morris had established a prima facie case that a pattern of discrimination existed.  The court then stated: "I think seven out of eight *could* be a pattern; but—and so, I believe the Rule requires me to consider the rationale given; but, I continue to rule—to overrule the objection."  (Emphasis added.)

Typically, to avoid collapsing the Batson test, the court should first make a preliminary determination that the challenger has demonstrated a prima facie showing of discrimination before eliciting the State's gender-neutral explanation.  Wright, 78 Wn. App. at 100-01.  When the State provides an explanation and the court rules on the ultimate question of discrimination, the preliminary prima facie

case is unnecessary. Hicks, 163 Wn.2d at 492. In the instant case, however, the State's explanation as to juror 115 did not render the prima facie case moot. Although the court should have asked Morris for further proof of a pattern before eliciting a response from the State, we disagree that this misstep rendered the prima facie case moot. While the court indicated that there *could* be a pattern, it then, in direct response to the State's inquiry about ruling on whether Morris had established a prima facie case concerning a pattern of discrimination, stated,

> I think seven out of eight could be a pattern; but—and so, I believe the Rule requires me to consider the rationale given; but, I continue to rule—to overrule the objection because political beliefs are not a protected category. Peremptories have a long-standing—the long-standing tradition of peremptory challenges in our system of justice is that unless—unless it's prohibited due to an improper motive based on excluding members of a protected category, in general, Counsel, exercise at their discretion to benefit their client's position.

While the court indicated it *could* be a pattern, we conclude that the above statement and the court's actions are inconsistent with the court having made a determination that a prima facie showing of a pattern was made.

In any event, the circumstances of the present case do not support a conclusion that the court's determination was clear error. Although the State's use of seven peremptory challenge against men could, at first glance, appear disproportionate, the State also struck a female juror. And the female juror was stricken after the State had exercised four peremptory strikes against male jurors but before the final three strikes. Of the seven male jurors stricken by the State, three were replaced by other male jurors whom the State did not attempt to strike. The State also waived its last peremptory challenge, which could have

24

been used to remove another male juror. Moreover, the State accepted the jury on two separate occasions: once after it had struck only two men and once after it had struck six men and one woman. On both occasions, the jury consisted of six men and ten women. We also note that Morris, too, struck seven male jurors. At the end of voir dire, there were six men and ten women on the final jury. The original venire consisted of 130 people, 66 men, 64 women, and 1 non-binary person.

On appeal, Morris contends that the court erred by not requiring the State to give a neutral explanation for each of the seven male jurors in the alleged pattern. But aside from the fact that seven male jurors were struck, Morris does not provide any other relevant circumstances that would indicate bias or discrimination. Without more, we are unconvinced that a discriminatory purpose existed or that the court committed clear error in finding none. Finally, we note that venires commonly consist of only male and female jurors. That a "pattern" emerges in a party's use of peremptory challenges against a specific gender is not enough on its own to constitute discriminatory intent; such a "pattern" may very well be random. To establish a prima facie case, the strikes must be accompanied by relevant circumstances indicative of discrimination, such as discriminatory comments by the party exercising the challenge.[7] Here, the record

---

[7] Relying on Zant v. Stephens, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983), Morris also maintains that political affiliation is constitutionally suspect and that the court erred in concluding that the State's explanation for striking juror 115 was not discriminatory. We disagree. The Zant court discussed constitutionally impermissible factors to consider at sentencing—not jury selection—and only stated that the political affiliation of the *defendant* should not be relied upon. 426 U.S. at 885 (". . . factors that are constitutionally

supports that the court properly reviewed the alleged pattern and concluded that a discriminatory pattern did not exist. We conclude that the court's finding was not clearly erroneous.

### Jury Selection

Morris maintains that by conducting voir dire via Zoom, the court violated his constitutional right under article I, section 21 of the Washington Constitution to in-person jury selection. He also argues that Zoom voir dire violated his ability to select a fair jury and his right to be present. Finally, he contends that the trial court violated a local rule by proceeding with jury selection over his objection. We disagree.

A trial court has wide discretion in conducting voir dire. State v. Wade, __ Wn. App. 2d __, 534 P.3d 1221, 1229 (2023). Absent an abuse of discretion and a showing of prejudice, the trial court's ruling on the scope and content of voir dire will not be disturbed on appeal. Wade, 534 P.3d at 1229. The court abuses its discretion if its decision is manifestly unreasonable, rests on untenable grounds, or is made for untenable reasons. Wade, 534 P.3d at 1229.

1. Article 1, Section 21

This court recently addressed whether article 1, section 21 of our state constitution applied to jury selection and concluded it did not. State v. Booth, 24 Wn. App. 2d 586, 604-05, 521 P.3d 196, review denied, 1 Wn.3d 1006, 526 P.3d

---

impermissible or totally irrelevant to the sentencing process, such as for example, the race, religion, or political affiliation of the *defendant* . . ." (emphasis added)). Zant does not address whether the political affiliation of jurors is an acceptable basis on which to exercise a peremptory strike.

849 (2022). In <u>Booth</u>, we engaged in a <u>Gunwall</u>[8] analysis to address whether article I, sections 21 and 22 of our state constitution protected the use of peremptory challenges in criminal jury selection proceedings. 24 Wn. App. 2d at 601-02. We explained that article I, section 21 governs a litigant's right to a jury trial while article I, section 22 governs jury selection and that the two sections serve complementary roles. <u>Booth</u>, 24 Wn. App. 2d at 604. We concluded that article 1, section 21 did not apply to jury selection and to interpret it as such would render article I, section 22's protections superfluous. <u>Booth</u>, 24 Wn. App. 2d at 604-05.

<u>Booth</u> controls in the present case. Because article 1, section 21 does not govern jury selection procedures, we disagree that it necessitates in-person jury selection.

### 2. Ability to Select a Fair and Impartial Jury

Next, Morris asserts that conducting voir dire via Zoom violated his right to a fair and impartial jury because he was unable to properly assess the jurors' demeanor or credibility. He also contends that remote voir dire prevented the potential jurors from understanding the significance of the proceedings because they could not feel the gravitas of being present in a courthouse. Finally, he maintains that remote voir dire resulted in unequal juror experiences due to variances in the quality and size of the potential jurors' video screens. We are unpersuaded.

---

[8] <u>State v. Gunwall</u>, 106 Wn.2d 54, 720 P.2d 808 (1986).

Our federal and state constitutions guarantee criminal defendants the right to an impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. This guarantee includes "the right to have a jury drawn from a fair cross section of the community." State v. Meza, 22 Wn. App. 2d 514, 533, 512 P.3d 608, review denied, 200 Wn.2d 1021, 520 P.3d 978 (2022). Voir dire is central to protecting this right, because it permits the parties to "ask questions and engage in discussion with potential jurors to draw out potential bias." State v. Bell, 26 Wn. App. 2d 821, 829, 529 P.3d 448, review denied, 1 Wn.3d 1035, 536 P.3d 181 (2023). "But voir dire is more than just a question and answer session," it also allows the parties to assess a potential juror's credibility via nonverbal cues, which are often more indicative of a juror's real character. Bell, 26 Wn. App. 2d at 829. The scope of voir dire should be coextensive with its purpose, which " 'is to enable the parties to learn the state of mind of the prospective jurors, so that they can know whether or not any of them may be subject to a challenge for cause, and determine the advisability of interposing their peremptory challenges.' " State v. Frederiksen, 40 Wn. App. 749, 752, 700 P.2d 369 (1985) (quoting State v. Laureano, 101 Wn.2d 745, 758, 682 P.2d 889 (1984)).

The trial court's broad discretion in conducting voir dire is limited "only by the need to assure a fair trial by an impartial jury." State v. Brady, 116 Wn. App. 143, 147, 64 P.3d 1258 (2003). The court abuses its discretion if it "adopts a view that no reasonable person would take." State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

In response to the COVID-19[9] pandemic, Washington courts instituted a variety of practices to ensure that trials could continue safely.  Our State Supreme Court issued an order requiring courts to "conduct all [jury trial] proceedings consistent with the most protective applicable public health guidance in their jurisdiction."  Ord. re: Modification of Jury Trial Proc., In re Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency, at 3 (Wash. June 18, 2020) https://www.courts.wa.gov/content/ publicUpload/Supreme%20Court%20Orders/Jury%20Resumption%20Order% 20061820.pdf [https://perma.cc/S5YJ-BWPR].  It also noted that "[t]he use of remote technology in jury selection, including use of video for voir dire in criminal and civil trials, is encouraged to reduce the risk of coronavirus exposure."  Ord. re: Modification of Jury Trial Proc. at 3.  King County Superior Court issued a similar order authorizing in-person criminal jury trials with remote voir dire. Emergency Ord. #27 re: Crim. Cases, No. 21-0-12050-3, Suspension of In-Person Criminal Jury Trials Through February 12, 2021 (King County Super. Ct., Wash. Jan. 22, 2021) https://kingcounty.gov/~/media/courts/superior-court/docs/ COVID-19/FILED-Emergency-Order27-KCSC-210120503.ashx?la=en [https:// perma.cc/X2JE-4YGV].

Morris's arguments about the burdens of Zoom voir dire are without merit. At the time voir dire took place, masking was still mandatory in King County.  Had voir dire been conducted in-person, the venire would have been masked and

---

[9] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

Morris likely would have had more difficulty ascertaining the jurors' demeanor. In contrast, on Zoom, the jurors did not need to be masked and Morris could easily see their full faces on his computer screen. Zoom voir dire also permitted Morris to see each of the jurors clearly, as opposed to in-person voir dire where jurors could be in a faraway row, or hidden by other jurors surrounding them. Moreover, the jurors were given clear instructions on remote voir dire procedures to ensure that they were fully engaged and fully attentive to the process.

Given that voir dire took place at the height of the COVID-19 pandemic, we disagree that the court's decision to conduct voir dire remotely was an abuse of discretion. The court implemented reasonable voir dire procedures to protect the health and safety of all involved parties. These procedures did not violate Morris's ability to select to a fair and impartial jury.

### 3. Right to be Present

Morris also maintains that remote voir dire violated his right to be present. We are unconvinced.

Criminal defendants have the right to be present at all critical stages of trial, including voir dire. State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). Whether this right has been violated is a question of law that we review de novo. Irby, 170 Wn.2d at 880.

In accordance with orders from King County Superior Court and our State Supreme Court, the trial court conducted voir dire remotely via Zoom. The court noted that voir dire would not exclude anyone who did not have access to internet and that anyone who wished to attend voir dire in-person could do so.

30

Morris cites no authority for his contention that the right to be present means the right to be present in-person with the entire venire. Nor does he explain specifically how his right to be present was "burdened" by remote voir dire. As Morris was able to attend voir dire in-person himself and was able to view the venire via Zoom, we conclude that his right to be present was not violated.

4. Violation of LCrR 4.11

Lastly, Morris claims that the trial court violated LCrR 4.11(b) because the parties did not agree to remote voir dire. This court recently rejected a similar claim in Wade.

In Wade, the defendant objected to remote voir dire and later claimed that the trial court violated LCrR 4.11(b) by proceeding with remote voir dire over his objection. 534 P.3d at 1230. On appeal, we explained that the trial court properly relied on the Supreme Court's October 2020 and June 2020 Orders and King County Superior Court Emergency Order #27 when it allowed for remote jury selection. Wade, 534 P.3d at 1231. We concluded that the trial court did not violate LCrR 4.11(b) because the Supreme Court's June 2020 order recognized that courts would need to adopt, modify, or suspend rules like LCrR 4.11 during the pandemic. Wade, 534 P.3d at 1231. We also noted that " 'local rules may not be applied in a manner inconsistent with the civil rules' promulgated by the Supreme Court." Wade, 534 P.3d at 1231 (quoting Jones v. City of Seattle, 179 Wn.2d 322, 344, 314 P.3d 380 (2013)).

The same holds true in the present case. When this case proceeded to trial in April 2021, all of the emergency orders at issue in <u>Wade</u> were still in effect. Therefore, our analysis in <u>Wade</u> applies here and we conclude that the court did not violate LCrR 4.11(b) by complying with the courts' orders and conducting voir dire via Zoom.

<u>Motion for Mistrial</u>

Morris asserts that the court abused its discretion in denying his motion for a mistrial after a witness stated that they'd seen Morris in an orange jumpsuit before. Because the comment did not result in prejudice, we disagree.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. <u>State v. Emery</u>, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). A court abuses its discretion if its decision is manifestly unreasonable, based on untenable grounds, or made for untenable reasons. <u>State v. Barry</u>, 184 Wn. App. 790, 797, 339 P.3d 200 (2014). A trial court should grant a mistrial "only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." <u>Emery</u>, 174 Wn.2d at 765. We consider three factors in determining whether an irregularity warrants a new trial: (1) the seriousness of the irregularity, (2) whether the statement was cumulative of other properly admitted evidence, and (3) whether an instruction would cure the irregularity. <u>State v. Perez-Valdez</u>, 172 Wn.2d 808, 818, 265 P.3d 853 (2011). We presume that jurors follow instructions and disregard improper evidence. <u>State v. Christian</u>, 18 Wn. App. 2d 185, 199, 489 P.3d 657, <u>review denied</u>, 198 Wn.2d 1024, 497 P.3d 394 (2021).

Morris challenges the following exchange with Joe Garcia, Gabrielle Garcia's father, in which the witness was asked to identify Morris in the courtroom:

[STATE]: And if you're not able to, that's okay.

[GARCIA]: Well, I should be able to, I sat in a bunch of hearings in the children's side.

[STATE]: Well—

[GARCIA]: —and he was in an orange jumpsuit, so—

[STATE]: Joe—Mr. Garcia—

[GARCIA]: Okay.

[STATE]: —if you're not able to make the identification, that's okay.

[GARCIA]: Okay. All right.

[DEFENSE]: Objection.

[COURT]: Yes. Ladies and gentlemen, please disregard the last statement by the witness.

Condon is instructive here. In Condon, a witness made three separate statements that the defendant had been in jail, in violation of a ruling in limine. 72 Wn. App. 638, 648, 865 P.2d 521 (1993). The witness testified that the defendant called her "when he was getting out of jail" and that he had asked her to pick him up from jail in Seattle. Condon, 72 Wn. App. at 648. Later, on cross-examination, the witness testified, "Yeah. I didn't tell her where I was picking him up. I'm not allowed to say that, but he was in a desperate situation that night." Condon, 72 Wn. App. at 648. The trial court granted the defendant's motion to strike the comments, denied the defendant's subsequent motion for a mistrial, and instructed the jury to disregard any references that the defendant was in jail. Condon, 72 Wn. App. at 648. This court upheld the trial court's ruling on appeal,

33

reasoning that the fact the defendant had been in jail did not mean he was guilty. Condon, 72 Wn. App. at 649. We also determined that the statements were not serious enough to warrant a mistrial and that the court's instruction was sufficient to cure any potential prejudice. Condon, 72 Wn. App. at 649.

Like in Condon, the court granted Morris's objection, struck the statements, and gave a curative instruction to the jury. We also note that the irregularity in the present case is less serious than that in Condon. Here, the witness made one passing statement, not three, that Morris had been in an orange jumpsuit. This comment was not prejudicial. Even though some jurors may have inferred that Morris was in custody, that would not be unusual given the nature of the charges. And nothing about the witness's reference to "a bunch of hearings" indicated how long Morris may have been in custody. We conclude that the court properly denied Morris's motion for mistrial.

### First Aggressor Jury Instruction

Morris claims that the court erred in giving a first aggressor instruction because it relieved the State of its burden of proving the absence of self-defense. Because such an instruction does not shift the burden of proof away from the State, we disagree.

A party is entitled to an instruction if it is "supported by substantial evidence in the record." State v. Griffith, 91 Wn.2d 572, 574, 589 P.2d 799 (1979). We review de novo whether sufficient evidence exists to support an instruction, viewing the evidence in the light most favorable to the party

requesting the instruction. State v. Bea, 162 Wn. App. 570, 577, 254 P.3d 948 (2011).

"Generally, a slayer may not claim self-defense to justify a killing when they were the aggressor or provoked the confrontation." State v. Hatt, 11 Wn. App. 2d 113, 135, 452 P.3d 577 (2019). A first aggressor jury instruction is appropriate where "there is credible evidence from which the jury can reasonably determine that the defendant provoked the need to act in self-defense" or "if there is conflicting evidence as to whether the defendant's conduct precipitated a fight." State v. Riley, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999). A first aggressor instruction is also appropriate if "the evidence shows that the defendant made the first move by drawing a weapon." State v. Anderson, 144 Wn. App. 85, 89, 180 P.3d 885 (2008). But such an instruction is not warranted "where the defendant undisputedly engaged in a single aggressive act and that act was the sole basis for the charged offense." State v. Grott, 195 Wn.2d 256, 272, 458 P.3d 750 (2020).

Contrary to Morris's assertion, first aggressor instructions do not relieve the State of its burden of proof. Our Supreme Court clarified recently that "first aggressor instructions are used to explain to the jury one way in which the State may *meet* its burden: by proving beyond a reasonable doubt that the defendant provoked the need to act in self-defense." Grott, 195 Wn.2d at 268. And here, the jury instructions stated that the State needed to prove the absence of self-defense beyond a reasonable doubt.

Viewing the evidence in the light most favorable to the State, a first aggressor instruction was warranted because there was some conflicting evidence as to who precipitated the events and there was evidence that Morris made the first move by drawing a knife. On the day of the murder, a folding pocketknife was found in Garcia's jacket pocket. Morris also sustained a cut on his finger. When asked about the cut during his police interview, Morris told detectives that Garcia did not have a knife that day but that "she had been armed before" and that he "didn't really think she would ever try to stab [him]."

But at trial, Morris's story changed. He cross-examined one of the investigating detectives at length about the pocketknife found in Garcia's jacket, asking about the blade length and whether the user could "open it just one-handed." Morris then testified that, on the day of the murder, Garcia "had some big, dragon, shiny knife thing" and that he saw it "[a] few times." He also testified that Garcia kept "drawing [the blade] out," that she was shuffling things in her backpack, and that Garcia was fidgeting. He stated that he was "scared."

Morris also testified that Garcia's actions at the food court made him anxious:

> She—she had the baggy clothing and the phone fidgeting thing, and she had scratched herself a little. . . . I started panicking. I think I was mumbling to myself or something, I'm not certain. And that's—that's when the thing happened.
>
> She—she stood up and was starting to move a little bit and I . . . I freaked out. I got up and flicked the knife really quickly, and then she—she took one step. I don't know which leg. I don't know. She took some step. And then I started moving at her, and she screamed, obviously, and then this—this hook stabbing thing happened.

36

Because there was conflicting evidence as to who initiated the events—even though Morris asserts he was not implying that Garcia was the first aggressor—and there was evidence that Morris made the first move, we conclude that substantial evidence supported a first aggressor instruction. We also reject Morris's novel argument on appeal that there was no evidence indicating Morris was not the sole aggressor.

Imposition of Exceptional Sentence

Morris asserts that the court violated the Sixth and Fourteenth Amendments to the United States Constitution by making a factual determination that facts found by the jury were substantial and compelling reasons justifying an exceptional sentence. Our case law mandates a different result. This court considered the same argument in State v. Sage, 1 Wn. App. 2d 685, 407 P.3d 359 (2017), and determined that this inquiry is a legal one.

Whether the imposition of an exceptional sentence violates the Sixth and Fourteenth Amendments is a question of law that we review de novo. State v. Alvarado, 164 Wn.2d 556, 563, 192 P.3d 345 (2008).

The Sixth Amendment guarantees criminal defendants a right to trial by jury. This right, in conjunction with the due process clause of the Fourteenth Amendment, requires that each element of a crime be proved to a jury beyond a reasonable doubt. Alleyne v. United States, 570 U.S. 99, 104, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013) (plurality opinion). Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum is an "element" that must be submitted to the jury and proved beyond a

reasonable doubt. Hurst v. Florida, 577 U.S. 92, 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016); Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). The statutory maximum is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303 (emphasis omitted).

For the court to impose an exceptional sentence, the jury must first find "unanimously and beyond a reasonable doubt, one or more of the facts alleged by the state in support of an aggravated sentence" exist. RCW 9.94A.537(6). Then, the court must "find[], considering the purposes of this chapter, that the facts found [by the jury] are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.537(6). The court must set forth its reasons for imposing an exceptional sentence in written findings of fact and conclusions of law. RCW 9.94A.535.

Despite settled law to the contrary, Morris contends that the court engaged in impermissible fact finding by concluding that there are substantial and compelling reasons justifying an exceptional sentence. And although this court rejected the same argument in Sage, Morris claims that the court in Sage did not fully explain its reasoning. We disagree.

Like Morris, the defendant in Sage argued that the trial court engaged in fact finding, in violation of his Sixth Amendment right to a jury trial, by entering an exceptional sentence. 1 Wn. App. 2d at 707. This court disagreed, explaining that

38

> "once the jury by special verdict makes the factual determination whether aggravating circumstances have been proved beyond a reasonable doubt, '[t]he trial judge [is] left only with the legal conclusion of whether the facts alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence.' "

1 Wn. App. 2d at 708 (quoting State v. Suleiman, 158 Wn.2d 280, 290-91, 291 n.3, 143 P.3d 795 (2006)).

The Sage court also rejected Morris's argument that Washington's sentencing scheme is analogous to the sentencing scheme deemed unconstitutional by the Supreme Court in Hurst:

> In Hurst, the Supreme Court held Florida's death penalty procedure violated the defendant's Sixth Amendment right to a jury trial because the jury's findings of aggravating factors were advisory, resulting in prohibited fact finding by the judge. But the Florida statute at issue expressly state[d] that the jury findings were "advisory." FLA. STAT. § 921.141 (2004). By contrast, under Washington procedure here, the jury exclusively resolves the factual question whether the aggravating circumstances have been proven beyond a reasonable doubt.

1 Wn. App. 2d at 710 n.86.

We decline to deviate from our holding in Sage. In the present case, the jury entered special verdict forms with specific findings that the aggravating circumstances had been proved beyond a reasonable doubt. The court then noted on the record that the jury had made such findings and described the evidence that supported each finding. The court next concluded that the jury's findings constituted "[s]ubstantial and compelling interests" for imposing an exceptional sentence. The trial court properly analyzed and articulated its basis for imposing an exceptional sentence and did not engage in any fact finding.

Victim Penalty Assessment and DNA Fee

In supplemental briefing, Morris maintains that the victim penalty assessment should be stricken because the court determined he was indigent at the time of sentencing. He also contends that the DNA fee should be waived for the same reason. We disagree that the court determined Morris to be indigent, but remand for Morris to make such a motion as to the victim penalty assessment and the DNA fee.

The legislature recently amended RCW 7.68.035 to prohibit the imposition of a victim penalty assessment if the court finds that the defendant is indigent at the time of sentencing. See LAWS OF 2023, ch. 449, § 1 ("The court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent."). If the court does not make such a finding at sentencing, a defendant can later move to have the fee waived if they are unable to pay the penalty and the court must waive the fee. RCW 7.68.035(5)(b). The legislature also eliminated the DNA collection fee from RCW 43.43.7541. Under newly amended RCW 43.43.7541, the court must waive any DNA collection fee imposed before to July 1, 2023 upon a motion by a defendant.

Here, the court did not find Morris indigent at sentencing, but did grant his motion for an order to proceed in forma pauperis on appeal. Because such a finding was not made and Morris is now indigent, we remand for Morris to move to strike the victim penalty assessment. On remand, he may also move to waive the DNA collection fee.

We affirm the conviction and remand for Morris to move to strike the victim penalty assessment and DNA collection fee.

_Smith, C.J._

WE CONCUR:

_Díaz, J._                    _Chung, J._